**RECEIVED USDC ALSD**
By mpp at 4:26 pm, Jan 30, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| <u>ex rel.</u> CHRISTIAN M. HEESCH | ) | |
| | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. 11-364 |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | **FILED <u>EX PARTE</u>** |
| | ) | **AND UNDER SEAL** |
| | ) | |
| v. | ) | |
| | ) | |
| DIAGNOSTIC PHYSICIANS GROUP, P.C. | ) | **JURY DEMANDED** |
| IMC-DIAGNOSTIC AND MEDICAL, P.C. | ) | |
| INFIRMARY MEDICAL CLINICS, P.C.; | ) | |
| and INFIRMARY HEALTH SYSTEM, INC. | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |

**SECOND AMENDED
FALSE CLAIMS ACT COMPLAINT**

COMES NOW Relator, CHRISTIAN M. HEESCH on behalf of the UNITED

STATES OF AMERICA against DIAGNOSTIC PHYSICIANS GROUP, P.C. ( "DPG");

IMC-DIAGNOSTIC AND MEDICAL, P.C. ( "D & M CLINIC" ); INFIRMARY

MEDICAL CLINICS, P.C. ( "INFIRMARY CLINICS" );  and

INFIRMARY HEALTH SYSTEM, INC.  ("INFIRMARY HEALTH"); (sometimes

collectively referred herein as "Defendants") pursuant to the *qui tam* provisions of the

False Claims Act, *as amended*, *31 U.S.C. §§ 3729-3733* ("FCA") for violations

committed by Defendants and does file this Second Amended Complaint. In support of

this Second Amended Complaint, Relator, CHRISTIAN M. HEESCH on behalf of the UNITED STATES OF AMERICA adopt and incorporate all Exhibits previously filed with and in support of the initial Complaint **except for Exhibit "F",** an exhibit identified as "Draft June 24, 2011 of Employment Agreement, Physician-Employee and  D & M CLINIC". This Second Amended Complaint does add, edit  and amend the First Amended Complaint as follows:

1) adding  to the "Allegations" section of the First Amended Complaint  that the violations committed by Defendants  caused the intentional and significant overuse of medical tests, a large number of which involved  the administration of radioactive substances (nuclear imaging) and thereby knowingly exposing Defendants' patients to substantial risks of harm including the unnecessary risk of cancer ( ¶¶ 49 and 50 herein);

2)  adding allegations in sub-section titled " CONDUCT ENDANGERING PATIENT SAFETY AND CAUSING PATIENT HARM" ( ¶¶ 53-60 herein);

3) amend the alleged false claims dollar amount for years 2004 through 2010 from **$441,455,581.95** to **$521,600,559.00**  (¶¶ 71, 100 and 107 herein);

4) adding Count VII to the First Amended Complaint asserting Relator's personal claim for wrongful and retaliatory discharge pursuant to the whistleblower retaliation provisions of the False Claims Act, *as amended*, *31 U.S.C. §3730(h)*; (¶¶ 2 and 119 – 128 herein)

5)  adding Paragraph (a) to Paragraph (1) of the  "Prayer for Relief" section;

6)   adding Paragraph (2) to  the "Prayer for Relief" section asserting  damages and relief related to Relator's wrongful termination and retaliatory discharge claim in Count VII;

7)   deleting Paragraphs 4, 53-54 and 58 of the First Amended Complaint (these paragraphs if included in this Second Amended Complaint would be numbered Paragraphs 5, 63-64 and 68); and

8)   inserting the omitted word "Clinic" to Defendant IMC-DIAGNOSTIC AND MEDICAL, P.C. to correctly identify the entity as "IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C.", so that the Complaint now reads, states and alleges as follows:

## <u>INTRODUCTION</u>

1.  CHRISTIAN M. HEESCH ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against DIAGNOSTIC PHYSICIANS GROUP, P.C. ( "DPG" ); IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. ( "D & M CLINIC" ); INFIRMARY MEDICAL CLINICS, P.C. ( "INFIRMARY CLINICS" ); and INFIRMARY HEALTH SYSTEM, INC.  ("INFIRMARY HEALTH"); (sometimes collectively referred herein as "Defendants") for treble damages, penalties, attorney fees and costs, pursuant to the *qui tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§3729-3733* ("FCA") for violations committed by Defendants. The violations arise out of the submission of false and/or fraudulent claims  by Defendants for payment to federally-funded  Medicare and  Medicaid programs as well as other government agencies and federally-funded health care programs as a result of  referrals that were

illegal under the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b).*

2.   Relator also brings  actions on his retaliation claim pursuant to the whistleblower provisions of the False Claims Act, *as amended*, *31 U.S.C. §3730(h)* as a result of his wrongful termination  and discharge by Defendant DPG on July 27, 2011.

3.   This Complaint describes Defendants' practices of inducing Defendant DPG physicians to make patient referrals in violation of the Prohibited Physician Referral provisions of *42 U.S.C. §1395nn* and the Federal Anti-Kickback provisions of *42 U.S.C. §§1320a-7b* (sometimes referred to as the "Stark Law" and the "Anti-Kickback Law" respectively).  These practices which induced referrals include, but are not limited to, the provision of office space, facilities and equipment and any expansion or improvement office space, facilities, equipment furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services to referring physicians for free or less than fair market value.   The unlawful practices include the provision of excessive compensation and productivity bonuses directly related to each physician's referrals for technological testing performed within the office of Defendants D& M CLINIC. and INFIRMARY CLINICS, which is operated, managed and funded by and through INFIRMARY HEALTH. These productivity or "Stark bonus payments" represented additional financial windfalls to physicians locking in to "inner office" referrals going back at least to August, 2003, when Relator began his employment with Defendant DPG as a cardiologist.

4.   The illegal compensation scheme violative of Stark and Anti-Kickback laws alleged herein was devised and implemented years before Relator became affiliated with

Defendants in August, 2003.   Relator was in no way a planner or initiator of the fraudulent compensation scheme nor has he performed any act to advance the scheme. From his initial employment, Relator continuously made inquiries regarding methodology involved in determining his and other DP physicians' compensation without ever being provided any explanation until November, 2008.

6.  In April, 2011, comments made at the DPG shareholder meeting together with comments previously made in November, 2008 by a DPG financial officer cautioning DPG physicians from disclosing the Stark compensation methodology  in public because "it could be illegal", in part, motivated Relator to seek legal counsel and initiate the investigation resulting in this Complaint.     Notably, while Relator was first advised by Defendant DPG, in November of 2008, that the compensation "could be illegal", he was subsequently told by the DPG's President that the compensation methodology "is legally defensible".    Therefore, until April, 2011, Relator had, at best imprecise and contradictory information regarding the legality of the compensation methodology, with the majority of DPG's leadership representing that no violations of the law had ever occurred.   Further, and as outlined in more detail elsewhere, Relator's documented attempts to learn the methodology of how he and other shareholders were compensated were stopped by the DPG's leadership, and he was "strong-armed" to not pursue any further inquiry.

7.  On May 26, 2011 and prior to the filing of this Complaint, Relator and local counsel met with three (3) Assistant U.S. Attorneys of the U.S. Attorney of the Southern District of Alabama at their office in Mobile, Alabama (Renaissance Riverview offices) and disclosed the  information the basis of this Complaint. Relator and the undersigned

local counsel met with Assistant U.S. Attorneys:  Mr. John Cherry, Criminal Chief; Mr. Greg Bordenkircher, Criminal Section; and Mr. Gene Seidel, Civil Chief, at length discussing the subject of this action.

8.   On June 3, 2011, Relator through his counsel provided further information to the United States in follow-up to the May 26, 2011 meeting with Relator as requested by Mr. Cherry. Relator summarized again the information provided to the United States in the May 26, 2011 meeting and also provided supplemental information that was developed or surfaced after the meeting due to the continued investigative efforts of Relator.

9.   Relator brings this action based on his direct knowledge and also on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in *31 U.S.C. §3730(e) (4)*.  Notwithstanding same, Relator is an original source of the facts alleged in this Complaint.

## JURISDICTION AND VENUE

10.   The acts proscribed by *31 U.S.C. S 3729 et seq*. and complained of herein occurred in the Southern District of Alabama and Defendants among others, do business in the Southern District of Alabama.  Therefore, this Court has subject matter jurisdiction over this case and all Defendants pursuant to *31 U.S.C.  3732(a)*, as well as under *28 U.S.C. § 1345*.

11.   This Court has personal jurisdiction over the Relator because he resides in the Southern District of Alabama and conducts business herein.

12.   This Court has personal jurisdiction over all Defendants because all Defendants are located within the Southern District of Alabama and act as the provider of

healthcare services and products to Medicare, Medicaid, and TRICARE beneficiaries within the Southern District of Alabama. Each Defendant regularly performs services and submits claims for payment to Medicare/Medicaid/TRICARE (hereinafter collectively referred to as the "Federal HealthCare Programs") and accordingly is subject to the jurisdiction of this Court.

13.   Venue is proper within the Southern District of Alabama pursuant to *28 U.S.C. §§ 1391 (a) (1)* and *(2)*, because Defendants have offices within the Southern District of Alabama, and have performed numerous acts proscribed by *42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-7b (b)* and *31 U.S.C. §3729, et seq*, within the Southern District of Alabama.

## PARTIES

14.   Plaintiff and Relator, CHRISTIAN M. HEESCH ("Relator") resides in the Southern District of Alabama and has been a practicing interventional cardiologist with Defendant DIAGNOSTIC PHYSICIANS GROUP, P.C. since August, 2003. Since 2003, Relator has been a provider of healthcare services offering outpatient medical care and treatment at the office and clinic operated DEFENDANTS IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. and INFIRMARY MEDICAL CLINICS, P.C., both of which operate out of the same address at 1700 Springhill Avenue, Mobile, Alabama, and continues at the time of this Complaint. Relator routinely provided and provides healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama.

15.   Defendant DIAGNOSTIC PHYSICIANS GROUP, P.C. ("DPG") is an Alabama professional corporation that was incorporated on December 21, 1988 with its office located at 1700 Springhill Avenue, and presently employs 71 general and specialty physicians, with the majority being shareholders of DPG. Defendant DPG provides healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama. DPG does not employ any non-physician employees nor does it employ anyone for DEFENDANTS IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. and/or INFIRMARY MEDICAL CLINICS, P.C.

16.   Defendant IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. ("D & M CLINIC") is an Alabama professional corporation that was incorporated on January 3, 1990 and is a wholly-owned subsidiary of Defendant INFIRMARY MEDICAL CLINICS, P.C. located at 1700 Springhill Avenue and provides healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama. D& M CLINIC and  Defendant INFIRMARY MEDICAL CLINICS P.C. provide office space, facilities and equipment and any expansion or improvement office space, facilities and equipment; furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services  for and to DPG for  less than fair market value. D& M CLINIC is solely operated, managed and funded by Defendants INFIRMARY MEDICAL CLINICS P.C. and INFIRMARY HEALTH SYSTEM, INC.

17.  INFIRMARY MEDICAL CLINICS, P.C. ("INFIRMARY CLINICS") is an Alabama Non-Profit Corporation that was incorporated on August 22, 1988 and purportedly qualified as an exempt organization pursuant to *Section 501 (c) (3)* of the Internal Revenue Code. INFIRMARY CLINICS is the holding company of D& M CLINIC, which it operates, manages and funds. Defendant INFIRMARY CLINICS also operates manages and funds fourteen (14) or more other clinic subsidiaries with twenty-five (25) or more locations in whole or in part in the Southern District of Alabama. INFIRMARY CLINICS and D&M CLINIC provide office space, facilities and equipment and any expansion or improvement office space, facilities and equipment; furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services  for and to DPG for less than fair market value. All capital equipment purchases for D&M CLINIC must receive approval from administrators of Defendants INFIRMARY CLINICS and INFIRMARY HEALTH SYSTEM, INC. INFIRMARY CLINICS through INFIRMARY HEALTH SYSTEM, INC. employs and compensates all non-physician employees and the administrative staff of D & M Clinic some of whom services is billable to Federal HealthCare Programs. INFIRMARY CLINICS is a parent and alter ego of, and acts through various healthcare subsidiaries, including D&M CLINIC, and provides management, financial and reimbursement services for all such subsidiaries and channels funds from such subdivisions to itself and to Defendants DPG, D&M CLINIC and INFIRMARY HEALTH SYSTEM, INC.

18.  Defendant INFIRMARY HEALTH SYSTEM, INC. ("INFIRMARY HEALTH") is a healthcare management company engaged in the business of owning and

operating acute care hospitals, including Mobile Infirmary Association d/b/a Mobile Infirmary Medical Center, rehabilitation hospitals, outpatient facilities , twenty-eight (28) or more medical clinics, including Defendants INFIRMARY CLINICS and D& M CLINIC, and other healthcare services  to more than 600,000 residents along the Gulf Coast of Alabama, Mississippi and Florida including patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama. It is  an Alabama Non-Profit Corporation that was incorporated on November 23, 1982 and purportedly qualified as an exempt organization pursuant to *Section 501 (c) (3)* of the Internal Revenue Code. It is headquartered in Mobile, Alabama. INFIRMARY HEALTH is the parent company to Defendant INFIRMARY CLINICS and is integrally involved in the unlawful compensation scheme engaged in by Defendants DPG, D&M CLINIC and INFIRMARY CLINICS, in violation of the Stark and Anti- Kickback laws, as described herein. As such, any allegation herein against any Defendant is intended to include INFIRMARY HEALTH as a responsible party.

19.  All Defendants are health care providers and suppliers who participate in Federal HealthCare Programs.

## FEDERAL HEALTHCARE PROGRAMS

### The Medicare and Medicaid Programs

20.  Title XVIII of the Social Security Act, *42 U.S.C. §§ 1395, et seq*., established the Health Insurance for the Aged and Disabled, popularly known as the Medicare program. The United States Department of Health and Human Services ("DHHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer

contracts with insurance companies or Medicare contractors on behalf of DHHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

21.   CMS enters into contracts and pays for health care services provided to Medicare beneficiaries through insurance companies acting as Medicare ("fiscal intermediaries") contractors with the responsibility to process and pay health care claims under Medicare Part A which covers hospital and post-hospitalization services. *42 U.S.C. §§ 1395c-1395i-2 (1992)*. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services *42 U.S.C. §§ 1395k, 1395l, 1395x(s)*, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors ("carriers") process and pay claims for these services.

22.   Defendants submitted or caused to be submitted fraudulent claims to the United States through several Medicare Part B contractors in and around the Southern District of Alabama.

23.   Medicaid is a federally assisted grant program for the states enabling them to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels of services, and administrative and operational procedures. The state directly pays the providers for Medicaid services, with the state obtaining the federal reimbursement share of the payment from accounts drawn on funds from the United States Treasury. *42 C.F.R. §§*

*430.0-430.30* (1994). The State of Alabama, through the Alabama Medicaid Agency ("Alabama Medicaid") participates in the Medicaid program.

24.   Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through Alabama Medicaid in Alabama and the Southern District of Alabama.

## TRICARE

25.    TRICARE Management Activity, formerly known as CHAMPUS, ("TRICARE") is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. *10 U.S.C. §§ 1079, 1086*; *32 C.F.R. Part 199*. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

26.   Defendants submitted or caused to be submitted claims and received false and/or fraudulent funds from the United States through TRICARE in Alabama and the Southern District of Alabama.

27.  Government Healthcare Programs depend on physicians and other health care professionals to exercise independent judgment in the best interests of patients. Financia1 incentives tied to referrals have a tendency to corrupt the health care delivery system in ways that harm the federal programs and their beneficiaries. Corruption of medical decision-making can result when a physician refers a patient to a provider on the basis of the physician's financial self-interest instead of the patient's best interests.

### Defendants Participation in Federal HealthCare Programs

28.  By way of example of such participation and payments in Federal HealthCare Plans by Defendants, Relator reportedly had total charges of *$1,840,268* for the 1st and 2nd Quarters of 2009, one of the years the subject of this action, with the Medicare per centage of the charges being 63.46% and the Medicaid per centage of charges being 1.36%. For the 1st and 2nd Quarters of 2010, Relator reportedly had total charges of *$1,835,898*, again one of the years the subject of this action, with the Medicare per centage of the charges being 66.42% and Medicaid per centage of charges being 3.16 %. (See EXHIBIT **"A",** previously filed in support of Doc. 1 and incorporated herein)

29.  By way of further illustration of such participation and payments in Federal HealthCare Plans by Defendants, Relator had total charges of *$1,076.269.00* for January through March of 2007 (1st Quarter, 2007), one of the years in question hereunder, and for that period reported a payor mix for Relator alone that included 45.98% Medicare claims, 2.78% Medicaid, 0.28% TRICARE, and 0.03% TRICARE PR. (See **EXHIBIT "B",** previously filed in support of Doc. 1 and incorporated herein)

30.  As a condition of their participation in these Federal HealthCare Programs, Defendants are responsible for compliance with the legal and proper billing and reimbursement rules required by these programs. This responsibility is both stated and implied throughout various claim forms, conditions of participation, and Medicare and Medicaid program participation documents, all of which contain certifications of truth and accuracy which are signed by the provider or its authorized representative(s) and submitted to the above referenced Federal HealthCare Programs for payment.

31.  Defendants routinely and regularly required that newly employed physicians, including Relator, apply for approval and enroll in the Medicare and Alabama Medicaid

programs, and also enroll in the group assignment account of Defendant D & M Clinic after the commencement of and throughout the duration of the conduct complained of herein, to the present. The administrators and staff of Defendant D & M Clinic and/or Defendant Infirmary Clinic routinely prepared the necessary applications and material for signature and submission to the appropriate Medicare or Medicaid office. Among other things, the applications that the Defendants required Relator and other physicians to sign and were  submitted to federal payors certified that the Medicare/Medicaid providers would abide by relevant federal regulations, including *42 C.F.R. §424.57*, and subsection (c)(l), mandating that a provider "operate its business and furnish Medicare covered items in compliance with all applicable Federal and State licensure and regulatory requirements", including without limitation the Anti-kickback and Stark laws.

32. As a condition of his employment with Defendants, Relator was required to sign a "Certification Statement" containing nine (9) different agreements and an acknowledgment "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law). . . ." (See **EXHIBIT "C":** CMS Provider/Supplier Enrollment Application Form 855I (11/2001), previously filed in support of Doc. 1 and incorporated herein) Accordingly, Defendants expressly certified their understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions, including, but not limited to, the Federal anti-kickback statute and the Stark law . . ."

33.   Additionally, administrators and staff of Defendant D & M Clinic and/or Defendant Infirmary Clinic required Relator and other physicians to sign documents regarding the penalties for the submission of false and fraudulent claims to Alabama Medicaid, including FCA liability and possible criminal penalties (See **EXHIBIT "D":** Alabama Medicaid Provider Enrollment Application, (revised Jan. 2003), previously filed in support of Doc. 1 and incorporated herein). Thus, Defendants expressly understood the penalties for the submission of false and fraudulent claims to Alabama Medicaid.

## APPLICABLE LAW

34.   *Section 3729* of The False Claims Act ("FCA") provides in pertinent part and imposes liability on any person or entity who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
>
> * * * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

*31 U.S.C. § 3729(a) (1)-(3).*

35.   Falsely certifying compliance with the Stark and Anti-Kickback Laws in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. *United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88 (3rd Cir. 2009) (citations omitted); United State ex rel. Repko v. Guthrie Clinic, 557 F. Supp. 522 (M.D. Penn., 2008) (citations omitted).*

36.   The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States.  See *S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted* in *1986 U.S.C.C.A. 5266*).

### Stark Law (Physicians Self-Referral Law)

37.   The "Stark" statute, *42 U.S.C. §1395nn,* is also known the Physician Self-Referral statute. *42 U.S.C. §1395nn* (herein "Stark")*,* prohibits physicians from making a referral to an entity for the furnishing of designated health services, if a physician has a direct or indirect financial relationship (ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS") Stark also prohibits entities from billing for services provided pursuant to a prohibited referral.  If a financial relationship exists, all referrals and associated claims are illegal unless specifically exempted by statute.  *42 U.S.C. § 1395nn (a) (1) (A) and (B).* In other words, the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to CMS for such DHS unless the financial relationship fits in a statutory or regulatory exception.

38.   Liability under Stark involves three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; and (3) none of the Stark exceptions apply.

39.   Under Stark, a physician has a "financial relationship" with an entity if he has either "an ownership or investment interest in the entity" or "a compensation arrangement" with it. *42 U.S.C. §1395nn (a) (2).*  An ownership or investment interest in the entity may be an equity interest, a debt relationship or indirect ownership through controlling entities.

40.    A "compensation arrangement" consists, in pertinent part of "any arrangement involving remuneration between a physician . . . and an entity . . . ." *43 U.S.C. § 1395nn (h) (1) (A)*. "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *43 U.S.C. § 1395nn (h) (1) (B)*.

41.  Stark defines "referral" as "the request by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician)." *43 U.S.C. § 1395nn (h) (5) (A)*.

42.  Once the Plaintiff or government establishes proof of each element of a violation of Stark, the burden shifts to the defendant to establish the conduct was protected by an exception. *United States ex rel. Kosenske v. Carlisle HMA, Inc., at 95 (citation omitted)*.

43.    In contrast to the Federal Anti-Kickback Statute, Stark is only a civil prohibition. Stark is not a crime.  Stark is a strict liability statute that is violated whenever a prohibited referral is made or a prohibited claim is submitted, regardless of whether the health care provider intended, knew or should have known that the law prohibited the actions it took

### Anti-Kickback Law

44.    The Federal Anti-Kickback Act ("Anti-Kickback") makes it a crime to knowingly and willfully offer, pay, solicit or receive **any remuneration** to induce a person -

(1)     to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

(2)     to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

*42 U.S.C. §1320a-7b (b) (1) and (2).*

45.   The term "**any remuneration**" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind.  *42 U.S.C. §1320a-7b(c) (1).*  Any ownership interest or compensation arrangement that constitutes a financial relationship under Stark would also constitute remuneration as defined by Anti-Kickback, unless a kickback safe harbor applies.

46.   Knowing and willful conduct is a necessary element of this criminal offense. *42 U.S.C. §1320a-7b (b) (1).*  An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v Stacks*, 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any arrangement where *one* purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  *United States v Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v Greber,* 760 F.2d 68 (3d Cir.), *cert denied*, 474 U.S. 988 (1985).

47.   HHS has published safe harbor regulations that define practices that are not subject to Anti-Kickback because such practices would unlikely result in fraud or abuse. *See* 42 C.F.R. §1001.952.  The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement

qualifying for the safe harbor.  However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

## **ALLEGATIONS**

48.  Paragraphs 1 through 46 are incorporated as if fully set forth herein.

49.  Relator witnessed and was an unwitting participant in what he learned to be a fraudulent compensation scheme whereby proceeds derived from technology fees ("Stark Payments") were allocated to DPG physicians based upon and related to the number of referrals DPG physicians made to Defendants (in particular D & M CLINIC and INFIRMARY CLINIC) which thereby induced DPG physicians to make patient referrals in violation of Stark and Anti-Kickback, respectively, to Defendants. This fraudulent scheme has resulted in false certifications of compliance, thereby tainting all resulting claims submitted to Government HealthCare Programs from at least January, 2004 inclusive to the present.

50.  This scheme encouraged and resulted in the intentional and significant overuse of medical tests and as a consequence, Defendants collected and shared in the reimbursement of several million dollars annually for tests that were not medially necessary, a large number of which involved the administration of radioactive substances (nuclear imaging studies) and thereby knowingly exposed Defendants' patients to substantial risks of harm including the unnecessary risk of cancer

51.  Further, Defendants officers, administrators, and individual physicians, despite full knowledge of the substantial risk to patients, successfully inflated the number of nuclear imaging studies performed to generate technology fees by:

-       Noncompliance with the State of Alabama patient protection

        mandates regarding the use of radioactive substances;

-       Noncompliance with institutional patient protection guidelines; and

-       Outright falsification of medical records.

52.   From at least August, 2003 to present, Defendants engaged in financial relationships with physicians by paying remuneration to such physicians; unlawfully accepting those physicians' patient referrals, then unlawfully billing Medicare, Medicaid, TRICARE and other Government healthcare programs for designated health services rendered to those patients.  Defendants knowingly paid remuneration to the physicians with the expectation they would derive a greater benefit from patient referrals. Defendants took into account the value and volume of referrals to in making "bonus" Stark payments to DPG physicians.

53.   Defendant DPG continued to receive remuneration from Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH in return for referring patients to them for technology services which generated Stark payments. Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH continued to bill for services furnished pursuant to the referrals prohibited by Stark and Anti-Kickback, despite the inquiries by Relator and the advice of Defendants of the illegality of such self-referrals and kickbacks billed to and paid from Government HealthCare Programs.

## CONDUCT ENDANGERING PATIENT SAFETY
## AND CAUSING PATIENT HARM

54.  Dating back to January, 2008, Relator voiced complaints to Defendant DPG of the excessive ordering of nuclear imaging tests (nuclear stress tests) by DPG

physicians, many of which were not medically necessary and in fact, subjected patients to unnecessary danger through radiation exposure.

55.  Relator made repeated efforts to curtail or stop these unnecessary tests and his efforts resulted in a temporary reduction of nuclear stress tests and radiation exposure to patients, coupled with a reduction of moneys collected for said tests by Defendant DPG, for which he was criticized by DPG.

56.  In March, 2009, Relator **confidentially** reported abuses associated with the practices of the Nuclear Imaging Department of Defendant D & M Clinic to the Alabama Department of Public Health, insisting on confidentiality in his communications with said agency because he feared repercussions at work.  His complaint resulted in the Department of Public Health citing Mobile Infirmary Medical Center with violations, Severity Category III, for their improper nuclear imagining practices and required Defendant D & M Clinic to implement corrective measures in its nuclear imagining practice.

57.  Relator's direct attempts to reduce the number of medical tests with radiation exposure to patients, in conjunction with the mandates of the Alabama Department of Public Health, resulted in the implementation of a review process, whereby Relator and two other physicians with proper training in the handling and administration of radioisotopes ("licensed nuclear physicians") were to sign off on all test requests made by DPG physicians without  such proper credentials, by conducting a review of the medical records of the patient to be tested.  This review process, and the guidelines developed by Relator to reduce patient harm through exposure to radiation, was formally adopted by the D & M Clinic's Cardiology Department in January of 2008.

58.  However, Defendant DPG through its President Dr. F. Martin Lester, M.D., without knowledge or credentials in nuclear imaging, subsequently "watered down" the guidelines implemented by Relator, and Lester's "softer" review criteria were then implemented by DPG.

59.  Despite even the "watered down" review process, Defendants continued with the excessive test ordering practices so as to continue to generate compensation derived from Defendants compensation methodology  which directly rewarded DPG physicians for ordering more and more expensive tests, and lacked compensation incentives based on quality of care.

60.  DPG physicians would even falsify medical records, e.g. by stating on the nuclear request form that a patient had complained of chest pain, when the chart documented that the patient had specifically denied such a complaint, or by stating that the patient had an abnormal electrocardiogram (EKG), when in reality, the EKG in the chart was perfectly normal, in order to justify some unnecessary testing practices. Relator brought the blatant falsification of medical records he learned of to the attention of Defendant D & M Clinic and Defendant DPG; however, no action was taken.  In fact, Relator, repeatedly, was advised to curtail his "disruptive" writing of memoranda.

61.  The abuses which Relator complained of beginning in January, 2008 resulted not only in exposing patients to medical harm from the radiation associated with some of the tests but together with all other testing resulted in excessive compensation and productivity bonuses directly related to each DPG physician's referrals for the tests and thereby caused significant annual damages to Federal Healthcare Programs as well as Third Party Payors through fraudulent submissions and claims.

## DEFENDANTS KNOWLEDGE OF FRAUD

62.  Defendants officers and administrators knew of the fraudulent compensation scheme and even instructed outside auditors who came in to examine the financials of Defendant DPG in late 2008 to be thorough and comprehensive, but specifically instructed that the issue of Defendant DPG physicians' compensation and methodology of determining same not be part of the inquiry/audit.

65.  On June 9, 2011, Relator through counsel submitted a letter to Defendant DPG seeking to examine and inspect the records of Defendants DPG ("the Group" for purposes of this paragraph) and D & M Clinic ("Diagnostic & Medical" for purposes of this paragraph) for the following stated purposes:

- to determine the medical billings and collection amounts on procedures and services rendered by Dr. Heesch;
- to ascertain the distribution of monies coming into the Group and/or Diagnostic & Medical to Dr. Heesch and other doctors and shareholders;
- to ascertain the formula used in  distribution of the monies to the shareholders of the Group;
- to determine how monies for technical fees are distributed to the shareholders of the Group and others ;
- to discover how "pool monies" for other procedures are  distributed  to the shareholders of the Group including determining the  formula used in  the distribution of these funds ;
- to determine what payments if any to the Group which come  from Infirmary Health Systems &/or Mobile Infirmary Medical Center;
- to discover what payments if any are made to Infirmary Health Systems &/or Mobile Infirmary Medical Center from the Group;
- to learn  what payments if any made from  the Group to IMC – Diagnostic and Medical, P.C.; and
- to learn what payments if any are made to IMC – Diagnostic and Medical from the Group.

66. As an attachment to Relator's June 9, 2011 letter to Defendant DPG, Relator through counsel submitted a detailed list of records set out in a June 8, 2011 letter which was prepared by Relator's forensic accountant, Mr. Jeff Windham of Forensic Strategic

Solutions, P.C. to investigate the purposes set out in the June 9, 2011 letter. (See **EXHIBIT "E",** previously filed in support of Doc. 1 and incorporated herein)

67.  In follow up to Relator's June 9, 2011, Relator wrote Defense Counsel for Defendant DPG on June 13, 2011 in an effort to expedite the production of documents requested on or before June 17, 2011 and specifically stated and requested:

\*   \*   \*   \*   \*   \*   \*

1.  records and documents related to total compensation for physicians of the Group from 2004 up and through 2010;
2.  records and documents related bonus payments to physicians of the Group from 2004 up and through 2010;
3.  records and documents related professional charges and collections for physicians of the Group from 2004 up and through 2010;
4.  records and documents reflecting each physician's share of the Stark Pool collections (total amount and per centage of total collections) for 2004 up and through 2010;
5.  records and documents reflecting total Stark collections of the Group and specific allocation of collections to each doctor based on tests ordered but not performed by each physician from 2004 up and through 2010.

\*   \*   \*   \*   \*   \*   \*

69.  It was not until June 24, 2011 that Defendants showed any intent of implementing a physician's compensation methodology that at least on its face attempts to comply with Stark and Anti-Kickback laws; a fraudulent compensation scheme which had existed since at least August, 2003 and continues to present.

70.  Stark and Anti-Kickback laws prohibit payment by the United States for Medicare, Medicaid and other Government HealthCare Program services provided from illegal physician referrals of these patient beneficiaries or in exchange for kickbacks or payments to the referring physician or entity, and prohibit referrals by physicians to providers with which the referring physician(s) have a financial relationship, and payment by Medicare or Medicaid for goods or services resulting from a prohibited such

a referral. **EXHIBIT "G",** filed contemporaneously with the filing of Relator's initial Complaint and incorporated herein, contains tens of thousands of procedures termed "Physician Charges for Nuclear and Ultrasound" performed by Relator **alone** from May, 2006 through December 30, 2009 which Defendant D & M CLINIC billed patients, many of which were paid by Medicare, Medicaid, TRICARE and other Government payors, and resulted in illegal referral payments to DPG and its physicians by Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH.

71. From January, 2004 through December, 2010 inclusive, Defendants submitted at least **$521,600,559.00** worth of charges which Defendant D & M CLINIC unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors for designated health services rendered to patients who were beneficiaries of the Government Healthcare Programs. (See **EXHIBITS "H" and "H-1",** previously filed in support of Doc. 1 and incorporated herein)

72. From January, 2004 through December, 2010 inclusive, these kickback-induced referrals prohibited by Stark and Anti-Kickback generated in excess of *$18,600,000.00* in illegal Stark Compensation payments to DPG physicians, including to Relator. (See **EXHIBIT "H",** previously filed in support of Doc. 1 and incorporated herein)

### ILLEGAL FINANCIAL RELATIONSHIPS OF DEFENDANTS

73. On December 18, 1997, Defendant DPG entered into a "Physician Services Agreement" ("Agreement") with Defendant D & M CLINIC whereby DPG would provide all physician services for D & M Clinic , which would provide the office space, facilities and equipment and any expansion or improvement office space, facilities,

equipment furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services all at less than fair market value and bill, charge and collect for all services rendered to the patients of DPG and other Defendants. (See **EXHIBIT "I",** previously filed in support of Doc. 1 and incorporated herein) Subsequent to the execution of the Agreement, D & M CLINIC came under the operational control of INFIRMARY CLINICS, and INFIRMARY HEALTH and D & M CLINIC functioned in name only.

74. Pursuant to the Agreement, D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH would retain a per centage (approximately 42%) of the net collections each year for providing office space, facilities, equipment etc (See Paragraph 49). For all services, equipment, non-physician personnel, 42% was not "fair market value" for the provisions, services and use of the offices and facilities of the Clinic.

75. The Agreement provided that DPG physicians would be compensated by a percent of collections received by D & M Clinic ("Compensation Percentage"), which was **58.22%** of total net collections prior to calendar year 2002.

76. On January 1, 2003, the Agreement was amended ("Amendment") with the only changes being: (1) changing the Compensation Percentage for calendar year 2003 (the same as year 2002) to **58.77%;** and (2) setting out that the Agreement was to commence on January 1, 1998 and continue until December 31, 2012. (See **EXHIBIT "J",** previously filed in support of Doc. 1 and incorporated herein)

77. The Agreement only detailed one component of the compensation DPG physicians received from Defendants. The second component of DPG physicians'

compensation is the illegal Stark Compensation payments **which is not delineated in the Agreement, the Amendment or disclosed in a written agreement.**

78.  The Agreement stated, in pertinent part, "that in the performance of this Agreement they [DPG and D & M Clinic] will comply with all applicable laws and regulations, including but not limited to the, Ethics in Patient Referral Act, as amended ("Stark Law") and the regulations thereunder and any other laws and regulations pertaining to the billing of medical services." (See **EXHIBIT "J", ¶ 17, C., p.17**, previously filed in support of Doc. 1 and incorporated herein). Instead, Defendants instituted a fraudulent compensation scheme which as a component disbursed compensation in direct violation of the Physician Self-Referral provisions under Stark.

79.  On August 18, 2003, Relator signed his Employment Agreement with Defendant DPG. At and about the time of his employment, DPG and its administrators explained to Relator how a component of his compensation, not contained in his Employment Agreement or the  Physician Services Agreement and Amendment thereto, included a per centage of "Stark Law" compensation. (See **EXHIBITS "K" and "K-1",** previously filed in support of Doc. 1 and incorporated herein)

80.  From January, 2004 through December, 2010, Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH received *$243,741,164* in net collections from "Non-Stark Charges" from the Clinic and paid out to DPG physicians from the net collections the "Total Salary" of $*150,077,973* according to DPG accounting records, thereby making the **actual** compensation percentage **61.0%**, in excess of the Compensation Percentages specified in the Agreement and subsequent Amendment.

81.   From at least 2004 through the present, DPG compensated its physicians taking into account two (2) components: (1) the "Production Salary" based on the Agreement; and (2) illegal Stark Compensation payments which were derived for DPG physicians based on each physician's productivity in generating the total technology fees for DPG from referrals made to D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH. The "Total Salary" of DPG physicians includes a "Production Salary" component and the illegal Stark Compensation component.

82.   The first component of DPG physicians compensation was  determined by the individual collections of a doctor for his or her professional charges (i.e. moneys paid to DPG by Medicare, Medicaid, TRICARE, private insurance, or patients themselves for procedures, consultations etc.).  Of those collections, Defendant D & M CLINIC would purportedly charge an overhead, recalculated annually, and approximately 58% of the net collections would purportedly go to DPG physicians as taxable income.

83.   The second component of DPG physician compensation involved allocation of technical fees generated as a result diagnostic measures and tests ordered by DPG. Any DPG physician who ordered a procedure that was done at D & M CLINIC, such as X-rays, EKGs, echocardiograms, ultrasounds, nuclear stress tests etc, also received a portion minus overhead for collections on the technical fees (i.e. moneys paid not for the physician's work, but for the use of the machine, technologist's time, materials used, etc)

84.   Defendants developed a fraudulent scheme in an effort to avoid detections of the illegal Stark Compensation payments: Defendants would determine the originator (test-ordering DPG physician) for each Stark procedure collection, and, at the end of the year, each individual physician's ordering share of all the Stark procedures ordered and

- 28 -

moneys derived therefrom was calculated.  The **following year**, the physician would be paid a portion of DPG's total "Stark Collections" that corresponded to his or her share of the Stark procedures ordered by DPG the **previous year**.  His or her current Stark procedure ordering would be applied to Stark Compensation payments in subsequent year.

85.  Further, in order to not raise the suspicion of auditors, a small fraction of the Stark Collections was divided equally between all DPG physicians as an "Equal Stark Payment".  A substantially larger portion of the Stark Collections was divided amongst the physicians based on their Stark-ordering share of the previous year ("Preset Stark Bonus").

86.  Finally, Defendants introduced yet another variable to obfuscate further - a "fudge factor".  Every year, each physician's productivity based share of the Stark Collections (the "Preset Stark Bonus") did not exactly correspond to the prior year's ordering habits, but was deliberately kept a little lower or higher than the exact calculation, to keep an element of randomness to avoid detection.

87.  From at least 2004 through December, 2010, Defendants, together and with each other, distributed the illegal Stark and Anti-Kickback compensation to DPG physicians as "Preset Stark Bonus", an "Equal Stark Payment" and together with the first component, "Production Salary", thereby producing DPG physicians a "Total Salary".  (See **EXHIBIT "H",** previously filed in support of Doc. 1 and incorporated herein)

88.   From January, 2004 through December, 2010, Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH paid out to Defendant DPG illegal

Stark and Anti-Kickback collections in the amount of **$18,603,664.00** based on accounting records of DPG. (See **EXHIBIT "H",** incorporated herein)

## COUNT I

### (False Claims Act – Presentation of False Claims *31 U.S.C. § 3729 (1)*)

89.   Plaintiff and Relator realleges, adopts and incorporates by reference paragraphs 1 through 88 as if fully set forth herein.

90.   Defendants knowingly submitted false and fraudulent claims and payment request certifications to agents and officials of the United States Government in violation of *31 U.S.C. Section 3729(a)(I)*. As a result of this conduct, the United States and the American taxpayers have suffered millions of dollars in actual damages.

## COUNT II

### (False Claims Act; False Records or Statements *31 U.S.C. § 3729 (2)*)

91.  Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92.   Defendants knowingly constructed or used, or caused to be constructed or used, false records, documents and statements in order to get the payment and/or approval of false or fraudulent claims and payment certifications by officials and agents of the United States government in violation of *31 U.S.C. Section 3729(a) (2)*, and as a result of this conduct, the United States and the American taxpayers have suffered millions of dollars in actual damages.

## COUNT III

### (False Claims Act- Stark Violation)

93.   Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 92 as though fully set forth herein.

94.   The compensation arrangements between Defendant DPG and Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH are financial relationships under Stark.

95.   Defendant DPG physicians referred patients to Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH for the furnishing of designated health services for which payment may be made under the Social Security Act in violation of Stark.  *42 U.S.C. §1395nn (a) (1) (A).*

96.   Defendant DPG through its employed physicians, officers, directors and shareholders conspired to and did knowingly refer patients to Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH notwithstanding the existence of prohibited financial relationships among the Defendants in violation of the Stark Law, and Defendants unlawfully submitted claims to Medicare, Alabama Medicaid, and other Federal HealthCare Programs for goods and services supplied to patients as a result of such violative referrals.

97.   Defendant DPG is a separate and distinct legal entity from Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH.  The referrals made by Defendant DPG to Defendant D & M CLINIC and/or Defendant INFIRMARY CLINICS and/or Defendant INFIRMARY HEALTH did not qualify for the exception from the Stark referral prohibition for in-office ancillary services because none was wholly owned by DPG, the group practice.  *42 U.S.C. §1395nn (b) (2) (B).*

98.   The referrals made by DPG to Defendant D & M CLINIC and/or Defendant INFIRMARY CLINICS and/or Defendant INFIRMARY HEALTH did not qualify for any other statutory or regulatory exception from the Stark referral prohibition.

99.   DPG continued to receive remuneration from Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH in return for referring patients to them for technology services which generated Stark payments while Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH continued to bill for services furnished pursuant to the referrals prohibited by Stark, despite the inquiries by Relator and with actual knowledge of the illegality of such compensation arrangement and billings.

100.   As a consequence of such unlawful referrals, claims and payment, the Defendants have knowingly caused the submission of more than **$521,600,559.00** worth of charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and other Government healthcare payors for designated health services from January, 2004 up and through December, 2010 alone, which generated *$18,603,664.00* in false claims paid out to Defendant DPG and illegal collections in the amount of *$18,603,664.00* in violation of the Stark Law.

101.   As a direct and proximate result of this conduct, the United States and American taxpayers have suffered more than *$18,603,664.00* in actual damages from January, 2004 up and through December, 2010 alone.

## COUNT IV

### (False Claims Act – Anti-Kickback Law)

102.   Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 101 as though fully set forth herein.

103.   DPG physicians' compensation methodology involved as component remuneration in the form of Stark Compensation payments based on patient referrals from DPG to Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH.

104.   To induce patient referrals, Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH knowingly and willfully paid DPG remuneration prohibited under the Anti-Kickback in the form of the compensation arrangement betweens the Defendants.

105.   In return for patient referrals, DPG knowingly and willfully received from Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH. remuneration prohibited under the Anti-Kickback. *42 U.S.C. §1320a-7b (b) (1).*

106.   DPG continued to receive remuneration from Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH in return for referring patients to Defendants D & M CLINIC and INFIRMARY CLINICS, while Defendants D & M CLINIC, INFIRMARY CLINICS, and INFIRMARY HEALTH continued to bill for services furnished pursuant to the referrals prohibited by Anti-Kickback, despite the inquiries by Relator and with actual knowledge of the illegality of such compensation arrangement and billings.

107. As a consequence of such unlawful referrals, claims and payment, the Defendants have knowingly caused the submission of more than **$521,600,559.00** worth of charges which Defendants unlawfully billed to Medicare, Medicaid, TRICARE and

other Government healthcare payors for designated health services from January, 2004 up and through December, 2010 alone, which generated *$18,603,664.00* in false claims paid out to Defendant DPG and illegal collections in the amount of *$18,603,664.00* in violation of the Anti-Kickback Law.

108.   As a direct and proximate result of this conduct, the United States and American taxpayers have suffered more than *$18,603,664.00* in actual damages from January, 2004 up and through December, 2010 alone.

## COUNT V

### (The False Claims Act – *31 U.S.C. § 3729*)
### Stark and Anti-Kickback Violations

109.  Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 108 as though fully set forth herein.

110. The Defendants knowingly presented or caused to be presented false and fraudulent claims for payment to federally-funded health insurance programs, in violation of *31 U.S.C. §3729(a)(1)*.

111.   The Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, *inter alia*, *31 U.S.C. §3729(a)(2)*.

112.   The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to pay for medical services and products provided to individuals insured by the Federal HealthCare Programs.  Many of

the false claims submitted were directly related to Stark and Anti-Kickback violations set forth previously in this Complaint.

113.   As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## COUNT VI

### (Conspiracy - *31 U.S.C. § 3729 (3), (4) and (7)*)

114.   Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

115.   Defendants, as usual and customary business practices, conspired to and paid kickbacks, both directly and indirectly, overtly and covertly, in cash and in kind, to Defendant DPG and its physicians in exchange for patient referrals and engaged in other illegal and prohibited financial arrangements with Defendant DPG and its physicians, in violation of the Stark Law, *42 U.S.C. § 1395nn*, the Anti-Kickback Law, 4*2 U.S.C. § 1320a-7b (b)* and various other federal laws and regulations.

116.   Individually and collectively, Defendants, using the illegal health care referral system they created to defraud the United States, submitted false and/or fraudulent claims to the United States and also made false and/or fraudulent statements and certifications to the United States through their fraudulent participation in the Medicare and Medicaid programs. As a result, defendants received millions of dollars in actual damages in false and fraudulent payments from the United States for health care and related services provided to Medicare and Medicaid program beneficiaries.

117.   Defendants, between and amongst themselves, and others conspired to defraud the United States by having false or fraudulent claims paid or allowed, and

knowingly making, using, or causing to be made or used false records or statements to increase the obligations of payment by the United States.

118.   As a result of Defendants' actions, the United States has been, and will continue to be, severely damaged.

## COUNT VII

### (Retaliatory Conduct and Discharge – Whistleblower Retaliation)
*31 U.S.C. § 3730 (h)*

119.     Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 118 as though fully set forth herein.

120.     As stated above, Relator began his employment as a practicing interventional cardiologist with Defendant DPG since August, 2003.

121.     Shortly after his hiring and during his employment with Defendants, Relator made inquiry of Defendant DPG officers and directors regarding the legality of Defendants compensation methodology, including Stark violations, and made efforts to investigate and uncover same, including efforts to hire his own accountant to conduct such an inquiry. These efforts were rebuffed by Defendants.

122.     Until April, 2011, Relator had, at best imprecise and contradictory information regarding the legality of the compensation methodology, with the majority of DPG's leadership representing that no violations of the law had ever occurred.  Relator's attempts to learn the methodology of how he and other shareholders were compensated were stopped by the Defendant DPG's leadership, and he was "strong-armed" to not pursue any further inquiry.

123.     On June 9, 2011, Relator through counsel submitted a letter to Defendant DPG seeking to examine and inspect the records of Defendants DPG ("the Group" for

purposes of this paragraph) and D & M Clinic ("Diagnostic & Medical" for purposes of

this paragraph) for the following stated purposes:

- to determine the medical billings and collection amounts on procedures and services rendered by Dr. Heesch;
- to ascertain the distribution of monies coming into the Group and/or Diagnostic & Medical to Dr. Heesch and other doctors and shareholders;
- to ascertain the formula used in distribution of the monies to the shareholders of the Group;
- to determine how monies for technical fees are distributed to the shareholders of the Group and others ;
- to discover how "pool monies" for other procedures are distributed to the shareholders of the Group including determining the formula used in the distribution of these funds ;
- to determine what payments if any to the Group which come from Infirmary Health Systems &/or Mobile Infirmary Medical Center;
- to discover what payments if any are made to Infirmary Health Systems &/or Mobile Infirmary Medical Center from the Group;
- to learn what payments if any made from the Group to IMC – Diagnostic and Medical, P.C.; and
- to learn what payments if any are made to IMC – Diagnostic and Medical from the Group.

124.   Once Counsel for Relator became involved and increased efforts of

Relator to investigate the legality of the of Defendants compensation methodology,

including Stark violations, Defendants began retaliating against Relator in the terms and

conditions of his employment by Defendants, by and through its officers, agents, and

employees because of lawful acts done by him in the furtherance of an action under the

FCA.

125.   On July 27, 2011, Defendant DPG terminated Relator's employment and

status as a shareholder of Defendant and terminated his medical practice and association

with the other Defendants.

126. Defendants' retaliatory discharge of Relator was motivated by Relator's

engagement in protected activities of which Defendants had knowledge.

127.   Relator's termination on July 27, 2011 by Defendant DPG was the result of his undertaking the investigation the subject of this action and the allegations contained herein.

128.   Defendants have a duty under  31 U.S.C. § 3730(h) of the FCA to refrain from taking retaliatory actions against employees who undertake protected activities in furtherance of the FCA, including investigation for, testimony for, or assistance in an FCA action.

129.   Relator undertook protected activities actions in furtherance of this *qui tam action* and in furtherance of the FCA, including but not limited to investigation for, testimony for, or assistance in this action filed under the FCA and, as such, engaged in protected activity under the FCA and other laws.

130.   The actions of Defendants damaged and will continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

131.   Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Relator, CHRISTIAN M. HEESCH , acting on his behalf and the UNITED STATES OF AMERICA, demands and prays that judgment be entered in favor of  Relator and the United States against Defendants, jointly and severally, as follows:

(1)     **On Counts I through Count VI of this Complaint**:

(a) Defendants be ordered to suspend immediately their nuclear imaging program and further order the program be subjected to an independent outside audit by the United States or an entity designated by the United States, to implement and/or verify Defendants adherence to applicable Federal and State safety guidelines regarding nuclear imaging testing and applicable medical records keeping guidelines.

(b) Defendants be ordered to cease and desist from submitting and or causing the submission of any more false claims or in any way from otherwise violating *31 U.S.C. §3729 et seq* or from further violating *42 U.S.C. §1395(nn) et seq* or *42 U.S.C. §1320(a)-7(b) et seq,*

(c) That judgment be entered in Relator's' favor and against Defendants for treble the amount of the actual damages incurred by the United States of America, plus civil penalties of not less than Five Thousand, Five Hundred ($5,500.00) Dollars nor more than Eleven Thousand ($11,000.00) dollars per claim, as provided by *31 U.S.C. §3729(a)*, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants together with penalties for specific claims to be identified at trial after full discovery.

(d) That Relator be awarded the maximum amount allowed pursuant to the Stark statutes, Anti-Kickback Act and False Claims Act as cited and referenced herein;

(e) That judgment be granted for Relator and the United States and against Defendants for any costs, including, but not limited to, court costs, expert

fees and all attorneys' fees incurred by Relator's in the prosecution of this suit;

(f)   That United States and Relator's recover any and all damages available to them as a result of Defendants' stated violations of the Stark Laws, Anti-Kickback Laws and False Claims Act;

(g)   That Relator and the United States be entitled to any and other relief that they are entitled to, whether by law or equity;

(h)   That Relator and the United States be granted any other and further relief as Court deems just and proper; and

(2)   **On Count VII of this Complaint**, Relator and Plaintiff demands and prays judgment for all proper compensatory damages, special damages and  punitive damages in favor of Relator as a result of Defendant DPG's retaliation and retaliatory discharge of Relator in violation of 31 U.S.C. § 3730(h), including but not limited to the following: doubled back pay, interest on the back pay,   loss of pension, health and other employment benefits; future pay until age of retirement; compensation for all special damages, including emotional distress, mental suffering and anguish; humiliation; damage to his reputation; and inconvenience; plus  attorneys fees and costs;, and such other and further relief as the Court deems just and proper. as a result of Defendant DPG's retaliation and wrongful discharge.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and Relator, CHRISTIAN M. HEESCH respectfully demands trial of these claims by struck jury.

DATED this 30 January 2013.


Respectfully submitted,


**\s\CHRIST N. COUMANIS**_____
CHRIST N. COUMANIS (COUMC1593)
coumanis@c-ylaw.com


**\s\ DAVID YORK**_____
DAVID YORK (YORKD2887)
david@c-ylaw.com
Attorneys for Relator Christian M. Heesch



OF COUNSEL:

COUMANIS & YORK, P.C.
2102 Main Street
Post Office Box 2627
Daphne, Alabama  36526
lawfirm@c-ylaw.com
Phone: 251.990.3083
Fax:    251.928.8665

**Mobile Office:**
1206 Dauphin Street
P.O. Box 1646
Mobile, Alabama  36633
Phone:  251.431.7272


## CERTIFICATE OF SERVICE

I do hereby certify that I have on January 30, 2013 filed the foregoing pleading with the Clerk of the Court **UNDER SEAL** and have served the following counsel for the United States of America via  certified U.S. Mail  as follows:

Deidre L. Colson, Esq.
Asst. U.S. Attorney, Civil Division

U.S. Attorney, Southern Dist. Of AL
Riverview Plaza, Suite 600
63 South Royal Street
Mobile, AL  36602
deidre.colson@usdoj.gov

Douglas J. Rosenthal, Esq.
Trial Attorney
United States Department of Justice
Civil Division, Fraud Section
600 E Street, N.W.
Bldg. BCN-6932
Washington, DC  20004
Douglas.J.Rosenthal@usdoj.gov


\s\ **CHRIST N. COUMANIS**
CHRIST N. COUMANIS (COUMC1593)


**Once the Complaint is UNSEALED, Defendants are to be served via U.S. Certified Mail as follows:**

**F. Martin Lester, MD**
**President**
**Diagnostics Physicians Group, P.C.**
**1720 Springhill Avenue, Suite 100**
**Mobile, Alabama 36607**


**IMC - Diagnostic & Medical Clinic, P.C.**
**C/o M**r. **D. Mark Nix, Registered Agent**
**5 Mobile Infirmary Circle**
**Mobile, Alabama 36607**


**Infirmary Medical Clinics, P.C.**
**C/o M**r. **D. Mark Nix, Registered Agent**

**5 Mobile Infirmary Circle**
**Mobile, Alabama 36607**

**Infirmary Health System, Inc.**
**C/o Mr. D. Mark Nix, Registered Agent**
**5 Mobile Infirmary Circle**
**Mobile, Alabama 36607**