IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Christian M. Heesch, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| | ) | Civil Action No. 11-364-KD-B |
| DIAGNOSTIC PHYSICIANS GROUP, P.C.; IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C.; IMC-NORTHSIDE CLINIC, P.C.; INFIRMARY MEDICAL CLINICS, P.C.; and INFIRMARY HEALTH SYSTEM, INC. | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## THE UNITED STATES' COMPLAINT IN INTERVENTION

1.  The United States of America ("United States") brings this action against Defendants pursuant to the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), seeking treble damages and civil penalties, and also under common law theories of recovery.

2.  From July 2005 through December 2011 ("the relevant time period"), Defendants submitted, or caused to be submitted, millions of dollars in false claims to the Medicare program for "designated health services" ("DHS"), including clinical laboratory services and diagnostic imaging tests, that were referred by physicians with whom they had an improper financial relationship, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

3.     During the relevant time period, IMC-Diagnostic and Medical Clinic, P.C. ("IMC-DMC" or "the Clinic"), paid Diagnostic Physicians Group, P.C. ("DPG") a percentage of collections on items and services performed or referred by DPG physicians, including DHS referred by DPG physicians that was performed by IMC-DMC personnel on equipment owned by IMC-DMC and billed to Medicare by IMC-DMC and/or Infirmary Medical Clinics, P.C. ("IMC") in violation of the Stark Law.  From April 2008 through 2011, IMC-Northside Clinic, P.C. ("IMC-Northside") had a similar arrangement with DPG and its physicians.  As all Defendants knew, DPG in turn compensated individual DPG physicians for their referrals of diagnostic tests and DHS to IMC-DMC and/or IMC-Northside.  Defendants made these payments knowingly, in violation of the FCA.

4.     Defendants knowingly and willfully provided this compensation to DPG and its physicians to keep DPG and its physicians affiliated with Infirmary Health System, Inc. ("IHS"), to prevent them from affiliating with competitors, and to induce DPG physicians to refer federal health care business to IHS subsidiaries IMC-DMC, IMC-Northside, and Mobile Infirmary Medical Center ("Mobile Infirmary") in violation of the Anti-Kickback Statute and the FCA.

### Jurisdiction, Venue, and Parties

5.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment.  This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

6.     Venue is proper in the Southern District of Alabama pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

7.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because they reside and transact business in this District.

8.      Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 *et seq*. ("Medicare").

9.      Defendant DPG is a private professional corporation incorporated in the State of Alabama in 1988, with its principal place of business in Mobile, Alabama. During the relevant time period, DPG was owned by its physicians, who were also employees of DPG.

10.      Defendant IHS is a private, not-for-profit corporation incorporated in the State of Alabama in 1988, with its principal place of business in Mobile, Alabama. IHS is the largest non-governmental health care system in Alabama.

11.      Defendant IMC is a private, not-for-profit corporation incorporated in the State of Alabama, with its principal place of business in Mobile, Alabama.  IMC is a wholly owned subsidiary of IHS.IMC owns and operates IMC-DMC, IMC-Northside and other "IMC" medical clinics.

12.      Defendant IMC-DMC is a private corporation incorporated by IMC in the State of Alabama in 1990, with its principal place of business in Mobile, Alabama.  IMC-DMC is a medical clinic also known as "Diagnostic & Medical Clinic," with its primary location during the relevant time period at 1700 Springhill Avenue in Mobile, Alabama.

13.      Defendant IMC-Northside is a private corporation incorporated by IMC in the State of Alabama in 1988, with its principal place of business in Saraland, Alabama. IMC-

Northside is a medical clinic also known as "Northside Clinic," with its primary location during the relevant time period at 1020 Cleveland Road Saraland, Alabama.

14.     In the late 1980s, IHS created IMC to acquire physician practices in an effort to affiliate physicians with IHS and Mobile Infirmary. IMC purchased physician practices and created new clinic subsidiaries, including IMC-DMC and IMC-Northside, and entered into contractual arrangements or physician services agreements ("PSAs") with the individual physicians and physician groups, including DPG, to provide services to the clinic subsidiaries as independent contractors. IMC's acquisitions of physician practices and the execution of PSAs and physician employment agreements with physicians and physician groups were approved by IHS and the IHS Board of Directors. From the mid-1990s through 2008, IHS's and Mobile Infirmary's Boards of Directors shared the same members.

15.     Defendants are related entities with overlapping executives and employees. Multiple IHS executives had direct responsibility for the management of IMC, IMC-DMC and IMC-Northside. E. Chandler Bramlett served as Chief Executive Officer (CEO) and Chairman of the Board of IHS and President of Mobile Infirmary from the early 1990s until his retirement in 2008. During this time Bramlett was also Chairman of IMC and on the Board of Directors of every IMC Clinic acquired by IMC, including IMC-DMC and IMC-Northside. Mark Nix became CEO of IHS when Bramlett retired in 2008, and also assumed Bramlett's positions as Chairman of IMC and its subsidiary clinics, including IMC-DMC and IMC-Northside. Barre Sanders, IHS Executive Vice President of Physician Practices, began his employment with IHS as an office administrator at IMC-DMC in 1992 and was responsible for the management of IMC, IMC-DMC and IMC-Northside during the relevant time period. During the relevant time

period, Sanders was also an employee of DPG with responsibility for DPG's finances and accounting. Alan Whaley, former vice president of clinic operations for IMC, also served as administrator of Mobile Infirmary.

16. DPG physicians were also involved in the management of IHS and its affiliated entities. For example, Dr. F. Martin Lester, President of DPG from 1988 through the relevant time period, served on the Board of Directors of IHS from 1993-1995 and from 2003-2008. Lester also held positions on multiple Mobile Infirmary committees.

## The Law

## I. THE FALSE CLAIMS ACT

17. The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment to the United States government and for knowingly making or using false records or statements material to false or fraudulent claims paid by the United States. 31 U.S.C. §§ 3729(a)(1), (2); 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B) (as amended).

18. The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A), (B) … or (G); [or]
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.[1]  For purposes of the False Claims Act,

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

19.     The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C. § 3731(d).

## II.     THE STARK LAW

20.     The physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for eleven categories of "designated health services" ("DHS"), including clinical laboratory services and radiology and certain other imaging services, if such services were referred to the entity by a physician with

---

[1]     The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here.  Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case pending on or after June 7, 2008, by virtue of Section 4(f) of FERA.

whom the entity had a financial relationship that did not comply with a statutory or regulatory exception. The Stark Law further prohibits Medicare from paying any claims that do not comply with its terms. 42 U.S.C. § 1395nn(g)(1). The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to overutilization of DHS and corruption of medical judgment.

21.     Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare may not pay for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

22.     The regulations implementing the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

23.     A knowing violation of the Stark Law may also subject the billing entity to exclusion from participation in federal health care programs and civil monetary penalties. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

24.     In pertinent part, the Stark Law provides:

(a) Prohibition of certain referrals

(1)     In general

Except as provided in subsection (b) of this section, if a physician   . . . has a financial relationship with an entity specified in paragraph (2), then –

(A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

25.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

26.     A direct compensation arrangement exists "if remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i).

27.     An indirect compensation arrangement exists if (i) there is an unbroken chain of entities and financial relationships between the referring physician and the entity furnishing DHS, (ii) the referring physician receives compensation that varies with, or otherwise takes into account, the volume or value of the physicians' DHS referrals to the entity; and (iii) the entity furnishing DHS has knowledge of the remuneration being provided to the referring physician. *See* 42 C.F.R. § 411.354(c)(2).

28.     Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).  From December 4, 2007 through

September 30, 2008, all physicians were deemed to stand in the shoes of their physician organizations, except for physicians practicing at academic medical centers or integrated § 503(c)(3) health care systems.  72 Fed. Reg. 64161 (Nov. 15, 2007); 73 Fed. Reg. 48434, 48751-52 (Aug. 19, 2008).

29.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . .[is the] entity that has presented a claim to Medicare for the DHS . . . ."  42 C.F.R. § 411.351.

30.     DHS includes clinical laboratory services and radiology and certain other imaging services, including diagnostic imaging tests.  42 C.F.R. § 411.351.

31.     A "referral" includes any request by a physician for, or the certifying or recertifying of the need for, any DHS for which payment may be made under Medicare Part B, including a request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but does not include any DHS personally performed by the referring physician.  42 C.F.R. § 411.351.

32.     The Stark Law and its implementing regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, exceptions for "personal services arrangements" and "indirect compensation arrangements."  42 C.F.R. §§ 411.357(d), (p).  The Stark Law also contains exceptions that protect certain DHS referrals, regardless of whether the financial relationship between the referring physician and the DHS entity is an ownership/investment interest or a compensation arrangement.  These service-based exceptions include, among others, the exception for in-office ancillary services ("IOAS") furnished by a "group practice."  *Id.* at § 411.355(b).

33.    The IOAS exception allows a physician in a "group practice" (as defined at 42 C.F.R. § 411.352) to refer Medicare beneficiaries to his or her own group practice for the furnishing of DHS if certain requirements are satisfied regarding the location, performance, and billing of the DHS.

34.    The IOAS exception does not apply to DHS furnished by a physician group that is not a "group practice" as defined by the Stark Law.  In order to qualify as a "group practice" under the Stark Law, the physician group must, *inter alia*, be organized as a "single legal entity" and no physician who is a member of the group can be compensated directly or indirectly based on the volume or value of his or her DHS referrals, except for certain productivity bonuses and profit shares that are not directly related to the volume or value of referrals.  *See* 42 C.F.R. §§ 411.352(a), (g), (i).  A physician in a "group practice" may receive a productivity bonus based on services that he or she has personally performed or services "incident to" such personally performed services, or both, as long as the bonus is not determined in any manner that is directly related to the volume or value of DHS referrals by the physician (except that the bonus may directly relate to the volume or value of DHS referrals if the referrals are for "incident to" services).  *Id.* at 411.357(i)(1).

35.    In order to qualify for the exception for personal services arrangements, a compensation arrangement must meet, *inter alia*, the following statutory requirements: the compensation (A) does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (except for compensation received pursuant to a "physician incentive plan" as defined by the Stark Law).  *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).  A "physician incentive plan" under

§1395nn(e)(3) is defined very narrowly, and only applies to personal service arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. §1395nn(e)(3)(B)(ii).

36.     In order to qualify for the Stark Law's exception for indirect compensation arrangements, the following requirements, *inter alia*, must be satisfied: (A) the compensation received by the referring physician is fair market value for items and services actually provided by the physician; (B) the physician's compensation is not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the DHS entity; (C) in the case of a bona fide employment relationship between an employer and a physician, the arrangement is commercially reasonable even in the absence of referrals to the employer; and (D) and the arrangement does not violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p).

## III.     THE ANTI-KICKBACK STATUTE

37.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C.

§ 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

38.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.  In pertinent part, the statute provides:

> (b) Illegal remuneration . . .
>
>> (2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>>
>>> (A)      to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> (B)      to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

39.     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program. Violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties.  42 U.S.C.  § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

## IV. THE MEDICARE PROGRAM

40.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the Medicare program.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A.  Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), which is part of the Department of Health and Human Services.  At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by healthcare providers.   42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

41.     To participate in the Medicare program as a new enrollee, physicians and non-physician practitioners must submit a Medicare Enrollment Application, CMS Form-855I.  Physicians also submit Form-855I if they are reactivating or revalidating Medicare enrollment or changing certain enrollment information.

42.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516(a)(1). When a physician signs the certification statement contained in Form CMS-855I, he or she attests as follows:

> I agree to abide by the Medicare laws, regulations and program instructions . . . .
> I understand that payment of a claim by Medicare is conditioned upon the claim
> and the underlying transaction complying with such laws, regulations, and
> program instructions (including, but not limited to, the Federal anti-kickback
> statute and the Stark law), and on the supplier's compliance with all applicable
> conditions of participation in Medicare.

43.     If the physician provides services in a physician practice or other organization setting, then the physician must complete Form CMS-855R, to reassign benefits to each organization that will bill for the physician's services.

44.     Clinics, such as IMC-DMC or IMC-Northside, enter into participation agreements with Medicare using Form CMS-855B to establish eligibility to participate in the Medicare program.  Clinics also complete CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

45.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

46.     Authorized officials for IMC-DMC and IMC-Northside signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the clinics were legally and financially required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Anti-Kickback Statute and the Stark Law.

47.     All DPG physicians executed Form CMS-855I as initial enrollees in the Medicare Program.  Each DPG Physician completed Form CMS-855R, and reassigned his/her rights to payment from Medicare to IMC-DMC and/or IMC-Northside during the relevant time period.

48.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

49.     To obtain Medicare reimbursement for certain outpatient items or services, providers submit claims using forms known as CMS 1500s.  Among the information the provider

includes on a CMS 1500 form are certain five-digit codes, known as Current Procedural Terminology Codes, or CPT codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

50. The Medicare statute requires each request for payment or bill submitted for an item or service payable under Medicare Part B to include the name and unique physician identification number for the referring physician when the entity knows or has reason to believe there has been a referral by a referring physician with the meaning of the Stark Law. 42 U.S.C. § 1395l(q)(1). The physician listed as the "referring provider or other source" in Box 17 of the form CMS 1500 is a referring physician under the Stark Law and regulations.

51. During the relevant time period, Cahaba Government Benefit Administrators, LLC was responsible for processing Medicare Part B claims in the State of Alabama.

52. During the relevant time period, Defendants knowingly submitted and caused to be submitted claims to Medicare through Cahaba Government Benefit Administrators, LLC, for services referred to Defendant clinics by DPG physicians.

**Defendants' Fraudulent Scheme**

53. During the relevant time period, Defendants engaged in a scheme to pay DPG physicians for referrals to IMC-DMC and IMC-Northside in violation of the Stark Law and Anti-Kickback Statute.

54. DPG and IMC-DMC/IMC had contractual arrangements dating back to 1988. In 1997, after the passage of the Stark Law and its expansion to include referrals for radiology and imaging services, these Defendants entered into a new written agreement that included certain

terms acknowledging the Defendants' duty to comply with the Medicare statute and regulations, specifically including the Stark Law, and stating their intent to satisfy both the IOAS exception and the "group practice" requirements under the Stark Law. However, Defendants did not follow their written agreement, and instead opted to continue paying DPG and its physicians as they had in the past, including for their referrals of DHS, in violation of the Stark Law and the Anti-Kickback Statute.

55. IMC-Northside entered into an agreement with DPG effective April 1, 2008, under which DPG physicians practicing at IMC-Northside were also paid for their referrals, including referrals of DHS, to IMC-Northside and IMC-DMC, in violation of the Stark Law and the Anti-Kickback Statute.

## I. Physician Services Agreement between IMC-DMC and DPG

56. DPG physicians provided services to IMC and IMC-DMC as independent contractors from 1988 through 2011 pursuant to physician services agreements between DPG and those entities.

57. The 1988 Physician Services Agreement ("1988 PSA") between DPG and IMC was signed by IHS CEO Bramlett, as Chairman of the Board of IMC.

58. The 1988 PSA stated:

> As compensation for all services provided for in this Agreement, IMC shall pay to [DPG] the sum equal to fifty-one percent (51%) percent [sic] ("Compensation Percentage") of collections received by IMC during the immediately preceding month . . . pertaining to services rendered by Physician Group to patients of the Clinic ("Net Collections") . . . .

59. Shortly after the 1988 PSA was executed, IMC-DMC was relocated to Springhill Avenue, on a lot adjacent to Mobile Infirmary, which was and is also a subsidiary of IHS. DPG

physicians were required to maintain privileges at Mobile Infirmary under the 1988 PSA and during the relevant time period.

60. In 1997, four years after the Stark Law was amended and extended to additional DHS, DPG and IMC-DMC executed a new Physician Services Agreement ("1997 PSA"). The 1997 PSA was signed for IMC-DMC by IHS CEO and Mobile Infirmary President Bramlett, as Chairman of IMC-DMC, and by current IHS CEO Nix, as "Vice President." Lester signed the 1997 PSA as President of DPG. Thirteen DPG physicians also signed the 1997 PSA.

61. Under the 1997 PSA, the parties agreed that DPG and its physicians would be responsible for all physician services at IMC-DMC. The parties agreed that the Clinic would be responsible for all overhead, including the office space and facilities, non-physician personnel (including nurses), equipment, disposable and expendable medical supplies, and billing services.

62. The 1997 PSA states:

As compensation for all services provided for in this Agreement, IMC[-DMC] shall pay to [DPG] the sum equal to a percent (the "Compensation Percentage") of collections received by IMC[-DMC] during the immediately preceding month . . . less any credits refunds or adjustments to collections ("Net Collections"), pertaining to professional medical services rendered by Physician Group or its physicians to patients of the Clinic . . . .

63. The 1997 PSA also provides:

The parties agree that in the performance of this Agreement they will comply with all applicable laws and regulations, including but not limited to, the Ethics in Patient Referrals Act, as amended ("Stark Law") and the regulations thereunder and any other laws and regulations pertaining to the billing of medical services. In this connection, the parties shall cooperate with each other to ensure compliance with such laws and regulations. The Physician Group agrees to take all steps as may be necessary or appropriate to meet the "in-office ancillary services" exception to the Stark Law whenever providing "designated health services." To this end, Physician Group agrees that it will take all steps necessary or appropriate to qualify and continue to qualify as a "group practice" within the meaning of the Stark Law and any regulations thereunder.

64.     Thus, to the extent the 1997 PSA purported to change the manner in which DPG had been compensated under the 1988 PSA, it limited the compensation to "professional medical services" and required the parties to cooperate to ensure compliance with laws and regulations, including the Stark Law.  However, in practice, Defendants continued to compensate DPG and DPG physicians in a manner that included collections from their referrals of DHS rendered by the Clinic, in violation of the Stark Law and without meeting the requirements of any exception.

65.     Under the 1997 PSA, the "Compensation Percentage" was adjusted each year based on IMC-DMC's profit or loss.  During the relevant time period, the "Compensation Percentage" varied between 57% and 61%.

66.     In 2003, IMC-DMC and DPG amended the 1997 PSA, extending the term of the agreement "until December 31, 2012, unless sooner terminated . . . ."  The 2003 amendment was signed by Lester as President of DPG and by IHS vice president Alan Whaley as Vice President of IMC-DMC.  The PSA was terminated effective January 1, 2012.

67.     During the relevant time period, IMC-DMC submitted claims to Medicare under its own tax identification number for services performed at the Clinic, including DHS referred by DPG physicians. IMC-DMC used the referring or ordering DPG physician's NPI or provider number to track his or her orders of DHS.  This information was  ultimately used to compensate the DPG physician for his or her DHS referrals.

68.     DHS performed at IMC-DMC during the relevant time period pursuant to referrals or orders from DPG physicians included clinical laboratory services and diagnostic tests, such as x-rays, ultrasounds, echocardiograms, and nuclear imaging tests.  Most, if not all, of the DHS performed at IMC-DMC was physically administered by technicians and employees

of IMC-DMC and was not personally performed by the referring DPG physician. DHS performed at IMC-DMC was performed on IMC-DMC-owned equipment and billed by IMC-DMC. IMC-DMC received payment from Medicare for the DHS.

## II. IMC-DMC Paid DPG for Referrals of DHS to IMC-DMC in Violation of the Stark Law and Anti-Kickback Statute.

69. During the relevant time period, IMC-DMC paid DPG for DPG physicians' referrals, including referrals of DHS, in violation of the Stark Law and the Anti-Kickback Statute. Pursuant to this arrangement, DPG and its physicians received compensation for services they did not personally perform.

70. During the relevant time period, IMC and IMC-DMC tracked and categorized IMC-DMC collections by "department," including a department called "510" for Medicare collections from procedure codes designated as DHS by CMS. IMC-DMC included department "510" collections in the percentage of collections it paid to DPG and its physicians each month as compensation under the 1997 PSA.

71. IMC or IMC-DMC provided DPG with a monthly "Stark report" that showed DHS collections by ordering DPG physician.

72. DPG distributed the department "510" collections, which Defendants also labeled "Stark collections," to its physicians differently than "non-Stark collections," which were collections for physicians' professional services and other items and services that IMC and IMC-DMC categorized as not DHS. "Non-Stark collections" were distributed to physicians based on their productivity share of IMC-DMC's overall collections. "Stark collections" were distributed to physicians using a "Preset Stark Bonus." The "Preset Stark Bonus" for each physician was set at the beginning of the year based on that physician's "510" or "Stark collections" in the prior

year or years.  Any amount from the "Stark collections" left over after "Preset Stark Bonuses" were paid to DPG physicians was distributed equally among the physicians as an "equal Stark payment."

73.     From 2003 through the relevant time period, Lester, DPG Treasurer Dr. William Gewin, and Sanders, who was also responsible for managing IMC and IMC-DMC during the relevant time period, were all involved in determining or memorializing the "Preset Stark bonuses" to be paid to each DPG physician each year.

74.     DPG physicians' "Preset Stark bonuses" and "Equal Stark payments" were memorialized in annual financial statements that DPG called "bonus spreadsheets" that were maintained by Sanders during the relevant time period.  These "bonus spreadsheets" reflected the final calculations used to determine the DPG physicians' pay for a particular year.

75.     During the relevant time period, new DPG Physicians' employment contracts stated:

> Physician-Employee understands, and it is agreed by the parties hereto, that collections for certain Medicare and Medicaid diagnostic services, designated under the Stark Law, shall be paid under a predetermined formula established by the Board of Directors of the Corporation, and are not paid as a percentage of collections directly attributable to the volume or value of such "designated services" generated by the Physician Employee.

76.     Although the DPG physician employment agreements referenced a "predetermined formula established by [DPG's] Board of Directors" for the distribution of DHS collections, in fact there was no predetermined mathematical formula used to determine DPG physicians' "Preset Stark bonuses."

77.     Further, despite these agreements, during the relevant time period, each DPG physician's compensation from "Preset Stark bonuses" and "Equal Stark payments" was

correlated to the collections from his or her referrals of DHS to IMC-DMC, as evidenced by the information in DPG's "bonus spreadsheets."

### III.  DPG Physicians Were Paid for Referrals of DHS to IMC-DMC and to IMC-Northside from April 2008 through 2011.

78.  IMC-Northside is located in Saraland, Alabama.  Before April 1, 2008, Mobile River Physicians, P.C., ("Mobile River") provided physician services to IMC-Northside as independent contractors.

79.  On April 1, 2008, the former Mobile River physicians joined DPG.  DPG executed a Physician Services Agreement with IMC-Northside ("Northside PSA"), naming the four former Mobile River physicians as providers to the IMC-Northside Clinic.  The Northside PSA was signed by Sanders as Vice president of IMC-Northside and Lester as President of DPG. Aside from a different "compensation percentage" payable to the former Mobile River physicians, the Northside PSA was almost identical to the 1997 PSA between DPG and IMC-DMC.

80.  Once the physicians at IMC-Northside joined DPG, they began receiving compensation for their referrals, including DHS referrals, to IMC-Northside and IMC-DMC that the DPG physicians did not personally perform.  For example, after April 1, 2008, DPG physicians who treated patients at IMC-Northside began ordering nuclear cardiology imaging tests, which was categorized by CMS as a designated health service at that time.  If the Medicare patient had the nuclear imaging test performed at IMC-DMC, the test was administered by IMC-DMC personnel, on equipment owned by IMC-DMC.  However, IMC-Northside, not IMC-DMC, billed Medicare for the technical component, or facility fee, of this test, and ultimately compensated the ordering Northside physician for the referral.

81.     An example of false claims submitted to Medicare by IMC-Northside and IMC-DMC under the arrangement described above is as follows. On June 23, 2009, nuclear heart imaging tests referred by an IMC-Northside physician were performed at IMC-DMC. IMC-Northside submitted Claim Number 492209183394910 under its tax identification for the technical component of the tests, which were performed at IMC-DMC. The professional components of these tests were billed by IMC-DMC under its tax identification number on Claim Number 492209182509770.

| Clinic Tax ID | Provider Name | Claim No. | Claim DOS | Procedure Code | Proc Code Description | Modifier | Modifier Description | Place of Service | Paid Amt | Referring Phys |
|---|---|---|---|---|---|---|---|---|---|---|
| IMC-Northside | Dixon | 492209183394910 | 6/23/2009 | 78464 | Heart Image (3D), Single | TC | Technical Component | Office | $143.62 | Dixon |
| IMC-Northside | Dixon | 492209183394910 | 6/23/2009 | 78464 | Heart Image (3D), Single | TC | Technical Component | Office | $ 143.62 | Dixon |
| IMC-Northside | Dixon | 492209183394910 | 6/23/2009 | 78480 | Heart Function Add-On | TC | Technical Component | Office | $ 20.87 | Dixon |
| IMC-DMC | Panayiotou | 492209182509770 | 6/23/2009 | 78464 | Heart Image (3D), Single | 26 | Professional Component | Office | $44.08 | Panayiotou |
| IMC-DMC | Panayiotou | 492209182509770 | 6/23/2009 | 78464 | Heart Image (3D), Single | 26 | Professional Component | Office | $44.08 | Panayiotou |
| IMC-DMC | Panayiotou | 492209182509770 | 6/23/2009 | 78478 | Heart Wall Motion Add-On | | | Office | $41.50 | Panayiotou |
| IMC-DMC | Panayiotou | 492209182509770 | 6/23/2009 | 78480 | Heart Function Add-On | 26 | Professional Component | Office | $13.13 | Panayiotou |

82.     Prior to joining DPG, the physicians at IMC-Northside did not receive compensation for referrals of diagnostic tests and DHS performed at IMC-DMC. In fact, before the Mobile River physicians joined DPG, as a practice the physicians typically did not order nuclear cardiology imaging tests. Instead the physicians referred the patients to cardiologists who then determined what tests were necessary. None of the DPG physicians at IMC-Northside

were cardiologists, and IMC-Northside did not have the equipment necessary to perform nuclear cardiology imaging tests.

## Knowledge

83.     Defendants knew that they were submitting claims or causing the submission of claims to Medicare in violation of the Stark Law and the AKS.

**I.     Defendants Were Fully Aware of the Financial Arrangements between IMC-DMC, IMC-Northside, DPG and DPG Physicians**

84.     Defendants all knew that DPG and its physicians were compensated with a percentage of the collections on DHS they referred to IMC-DMC and IMC-Northside during the relevant time period.

85.     Defendants all knew that the compensation provided to DPG included a percentage of IMC-DMC's and IMC-Northside's collections from DHS during the relevant time period.

86.     IMC-DMC, IMC-Northside, IMC and IHS also knew that DPG physicians were compensated with "Preset Stark bonuses" and "Equal Stark payments," and they knew the amounts of these payments.

87.     Sanders, who was employed by or had executive responsibilities at all of the Defendants during the relevant time period, maintained the "bonus spreadsheets" showing the final calculations of the DPG physicians' compensation, including each physician's department "510" collections (tracked as "Stark Collections"), "Preset Stark bonuses," and "Equal Stark Payments."

88.     During the relevant time period, Sanders also maintained spreadsheets that calculated DPG physicians' "gain" or "loss" from their DHS compensation compared to their

DHS orders. A 2009 spreadsheet calculated each DPG physician's "gain/loss" on his or her "Preset Stark bonuses" and "Equal Stark Payments" compared to his or her "Stark Collections" for each year from 2005 through 2008.

89. The IHS Physician Contract Review Committee, whose members included IHS CEO Nix, reviewed the employment agreements of new DPG physicians. New physician employment contracts and physician services agreements were approved by the IHS Board of Directors.

90. Defendants, including IHS, IMC, IMC-Northside, and IMC-DMC, thus knew that DPG distributed DHS collections to DPG physicians based on their DHS referrals and that there was no "predetermined formula" for distributing DHS collections, despite that representation in the DPG physician employment contracts.

## II. Defendants Knew That Medicare Required Compliance with the Stark Law and the Anti-Kickback Statute

91. Defendants knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare.

92. IMC-DMC and IMC-Northside certified that they would comply with all Medicare laws and regulations, including the Stark Law and Anti-Kickback Statute, on Form CMS-855B.

93. DPG physicians all certified, and many recertified during the relevant time period, on Form CMS-855I that they understood payment of a claim by Medicare was conditioned upon compliance with the Stark Law and Anti-Kickback Statute.

94. IHS knew that compensation arrangements with physicians "[m]ust [s]atisfy a Stark Law [e]xception" and must not violate the Anti-Kickback Statute.

### III. Defendants Knew that the Compensation Paid to DPG and DPG Physicians Violated the Stark Law and/or Anti-Kickback Statute

95.     In paying the compensation at issue, the Defendants violated their own written agreements, failed to monitor or ensure compliance with the Stark Law or Anti-Kickback Statute in any meaningful way, and ignored specific warnings about their financial arrangements.

#### a. Defendants' Conduct Did Not Comply with the 1997 PSA or the In-Office Ancillary Services Exception to the Stark Law

96.     Defendants' conduct violated the 1997 PSA in several material ways.

97.     The 1997 PSA stated that DPG would be paid a percentage of IMC-DMC's collections "pertaining to professional medical services rendered by Physician Group or its physicians to patients of the Clinic . . . ."  But IMC-DMC also paid, and DPG also accepted, a percentage of collections for DHS that were referred to IMC-DMC by DPG physicians, but performed by IMC-DMC personnel on IMC-DMC-owned equipment.

98.     The 1997 PSA also states that the parties will comply with all applicable laws and regulations, including specifically the Stark Law and the IOAS exception to the Stark Law.

99.     However, at no time during the relevant time period did IMC-DMC, IMC-Northside, or DPG qualify as a "group practice" eligible to use the IOAS exception to the Stark Law.

100.    To qualify as a "group practice" under the Stark Law, a physician group must be a "single legal entity."  *See* 42 C.F.R. § 411.352(a).  DPG, IMC-DMC and IMC-Northside are separate legal entities.  Defendants all knew that DPG and its physicians did not own the equipment or employ the personnel at IMC-DMC or IMC-Northside.

101.    Even if DPG had owned the clinics, the compensation arrangements still would have failed to satisfy the safeguards and requirements in the IOAS exception and "group practice" requirements pertaining to the billing and distribution of DHS revenues.

102.    In order for a "group practice" to satisfy the IOAS exception, it (or an independent third-party billing company) must bill Medicare for DHS performed by the group practice.  *See* 42 C.F.R. § 411.355(b)(3).  DPG did not bill for the DHS performed at IMC-DMC or IMC-Northside.  In practice and by written agreement, IMC-DMC and/or IMC billed for the DHS referred by DPG physicians under IMC-DMC's tax identification number.

103.    The DPG physicians' compensation also violated DHS compensation rules for "group practices" since the compensation was based on the physicians' DHS referrals and did not meet the conditions of the "Special rules [for p]rofits and productivity bonuses" for "group practices" under the Stark Law and regulations.  *See* 42 U.S.C. § 1395nn(h)(4)(B)(i); 42 C.F.R. § 411.352(i).

**b.  <u>Defendants Did Not Take Adequate Steps "to Ensure Compliance" with the Stark Law and Anti-Kickback Statute</u>**

104.    Defendants deliberately ignored or recklessly disregarded basic requirements for Stark Law and Anti-Kickback Statute compliance, despite being aware of, and certifying that they would comply with, these laws and regulations.

105.    Defendants did not train their employees or executives on Stark Law or Anti-Kickback Statute compliance so that they could evaluate and monitor such compliance at IMC-DMC or IMC-Northside.

106.    During the relevant time period, DPG physicians were responsible for a substantial portion of referrals to Mobile Infirmary.

107.     Defendants all knew that the compensation being paid to DPG physicians included a portion of the collections for their DHS referrals.  IHS obtained "Fair Market Value" ("FMV") analyses for new DPG physician contracts, but never followed up on the results.  For example, an FMV analysis was conducted of the IMC-Northside physicians' contract with DPG in 2008.  The analysis, prepared for Sanders as "Executive Vice President Physician Practices," substantially underestimated how much the physicians would be compensated.  It estimated the physicians would all be compensated within the 25th to 75th percentiles of the national salary surveys in their respective specialties.  In fact, in 2009 they were compensated well above the 90th percentile for their respective specialties.

108.     The DPG physicians' compensation was not evaluated for Stark Law or Anti-Kickback Statute compliance during the relevant time period or adjusted to comply with these laws and regulations.

### c.     Defendants Ignored Specific Warnings and Discussions about Stark Law Compliance Requirements

109.     Throughout the relevant time period, Defendants were aware that they had to comply with the Stark Law and Anti-Kickback Statute, but took no affirmative steps to ensure their compliance.  In fact, Defendants ignored specific warnings that their distributions of DHS collections to DPG did not comply with these laws and regulations.

110.     On June 28, 2010, Defendants specifically discussed Stark Law compliance at IMC-DMC and IMC-Northside.  At a meeting attended by Sanders, DPG executives, and IMC/IMC-DMC employees, Sanders summarized findings from DPG's counsel: "[Attorney] Horton's opinion – CMS would likely rule that because 2 entities exist we do not meet the strict definition of a 'Group Practice' and the IOAS exception was not available."

111.    On July 12, 2010, Lester acknowledged at a DPG Executive Committee meeting that if the physicians did not become employees of Mobile Infirmary "their agreement would need to be modified."  However, no changes were made to the agreement and DPG physicians continued to be compensated in the same manner for the remainder of the relevant time period.

112.    Physicians at DPG knew as early as 2002 that all of the parties needed to comply with the Stark Law with respect to the distribution of collections from DHS.  In 2002, Sanders explained to DPG physicians that the "[t]echnical and professional components [of DHS] are considered designated services under the Stark self-referral law."  Also in a 2002 document titled "Phys Pay Explained," Sanders stated that "'Stark' services collections are accounted for separately, and are paid to individual physicians by a bonus formula set in advance each year." Sanders knew during the relevant time period that there was no mathematical "formula" for determining these bonuses and that they were based on collections from each DPG physician's referrals of DHS to IMC-DMC.

113.    Stark Law compliance was also a subject of discussion in 2007 and 2008 during negotiations with the physicians at IMC-Northside to join DPG.  Dr. Jason Valentine, who was practicing at IMC-Northside as a Mobile River physician, raised questions about Stark Law compliance in correspondence with Sanders.  Valentine e-mailed Sanders on March 17, 2008, asking for a letter confirming that DPG was compliant with the Stark Law's IOAS Exception. No letter was provided.  In February 2007, Sanders authored a document titled "Northside - Valentine" stating that lab and x-ray collections were distributed using a "formula established to comply with the 'Stark Law'" and that only 2% of collections were for DHS.  Neither of those statements was true with respect to DPG's existing arrangement with IMC-DMC.  Sanders knew

at this time that IMC-DMC was compensating DPG for DHS referrals, and that DPG compensated each physician based on his or her DHS referrals. Sanders also knew at this time that DHS collections were well over 2%, and in fact over 5%, of the collections distributed to DPG.

114. In November 2008, during a DPG meeting attended by Sanders and other IMC-DMC and IMC-Northside employees, Lester raised the issue of Stark Law compliance in discussing potential physician employment by IMC-DMC or IHS.

115. On November 18, 2008, a DPG physician e-mailed Sanders with "An Idea re: Compensation," suggesting splitting the "Stark Money" evenly throughout the group. This suggestion was not taken, in part because Defendants wanted to continue rewarding physicians who ordered more DHS.

116. In approximately January 2009, IMC-DMC noted internal concerns regarding IMC-DMC's relationship with DPG and IMC-DMC's involvement with the "Stark Formula."

117. Despite these discussions, Stark Law and Anti-Kickback Statute compliance was not addressed, Defendants provided no training on Stark Law or Anti-Kickback Statute compliance to their employees or executives, and no changes were made to the compensation paid to DPG and DPG physicians.

### d. **Defendants' Conduct Induced Physicians to Order DHS and Other Tests at IMC-DMC and IMC-Northside**

118. DPG physicians were aware that they received a financial benefit from ordering tests at IMC-DMC and IMC-Northside that they did not receive from referring tests to other clinics and hospitals.

119. Physicians were even compensated for ordering tests outside of their specialties.

120.    For example, any physician at DPG who ordered a nuclear stress test was compensated based on the collections from the technical component of the test, regardless of whether that physician's specialty made such orders appropriate.  For example, the Alabama Department of Health requires that a licensed nuclear cardiologist select both the patient and appropriate dose for any nuclear radiology test.  In June 2009, IMC-DMC was cited by the Alabama Department of Health for "Failure to Follow the Authorized User Concept" which contains this requirement.  The Alabama Department of Health noted that "[c]ontrary to [the requirement], it was noted that at the Diagnostic and Imaging Clinic that individual physicians not identified as authorized users were routinely selecting the patient and prescribing the dose to be administered."

121.    Regardless of the appropriateness of the tests that they ordered, DPG physicians were given credit in their department "510" collections for the Medicare DHS that they ordered, and these collections were used to determine their compensation.

**e.    Defendants Entered into the Financial Arrangements in Order to Induce Referrals to IMC-DMC, IMC-Northside and other IHS Subsidiaries, and to Prevent DPG Physicians from Affiliating with Competitors**

122.    One of Defendants' purposes for paying DPG physicians for their referrals of DHS was to induce the physicians to make referrals to IMC-DMC and IMC-Northside, in violation of the Anti-Kickback Statute and the FCA.  Because DPG received a percentage of the collections for all services its physicians referred to IMC-DMC and IMC-Northside, the amount of compensation available to DPG to compensate physicians (and physicians' individual compensation) varied directly with the volume or value of the physicians' referrals.  Thus, DPG physicians had a financial incentive to order DHS and other services at IMC-DMC and IMC-

Northside, and indeed to order more of these services than they would in the absence of the financial arrangement.

123.    Another of the Defendants' purposes for paying DPG physicians for their referrals of DHS to IMC-DMC and IMC-Northside was to induce them to affiliate with and thereby refer to IHS-related entities rather than with competing providers.

124.    For example, Sanders stated in an email to Nix in 2009, summarizing his accomplishments, that by affiliating the IMC-Northside physicians with DPG and IHS, he had prevented them from referring tests to other practices:  "A strategic goal was achieved to affiliate Northside Clinic with Diagnostic & Medical to stop leakage to Springhill via referrals to Cardiology Associates and Pulmonary Associates.   Diagnostic & Medical successfully established Cardiology outreach to Monroeville, increasing referrals to [Mobile Infirmary]."

125.    IHS CEO Nix, in a 2010 presentation, referred to "the strategy used with the creation of Diagnostic & Medical Clinics which steers patients to Mobile Infirmary."

### f.    Each Defendant Knowingly Submitted or Caused the Submission of False Claims to Medicare

126.     Defendant IHS knowingly caused the submission of false claims to Medicare. IHS, through its executives and employees, including Bramlett, Nix and Sanders, had knowledge that DPG physicians were being compensated for referrals paid by Medicare in violation of the Stark Law and Anti-Kickback Statute.

127.    Defendant IMC knowingly caused the submission of false claims to Medicare. IMC, through its executives and employees, including Bramlett, Nix and Sanders, had knowledge that DPG physicians were being compensated for referrals paid by Medicare in violation of the Stark Law and Anti-Kickback Statute.

128.    Defendant IMC-DMC knowingly submitted false claims to Medicare.  IMC-DMC, through its executives and employees, including Bramlett, Nix and Sanders, had knowledge that DPG physicians were being compensated for referrals paid by Medicare in violation of the Stark Law and Anti-Kickback Statute.

129.    Defendant IMC-Northside knowingly submitted false claims to Medicare. IMC-Northside, through its executives and employees, including Bramlett, Nix and Sanders, had knowledge that DPG physicians were being compensated for referrals paid by Medicare in violation of the Stark Law and Anti-Kickback Statute.

130.    Defendant DPG knowingly caused the submission of false claims to Medicare. DPG, through its executives and employees, including Lester, Gewin, and Sanders, had knowledge that DPG physicians were being compensated for referrals paid by Medicare in violation of the Stark Law and Anti-Kickback Statute.

## Plaintiff Was Harmed by Defendants' Conduct

131.    Exhibit 1 to the complaint is a list of all the DPG physicians who made DHS referrals to IMC-DMC and IMC-Northside in violation of the Stark Law and/or the Anti-Kickback Statute during the relevant time period, and the dates during which each such physician had an improper financial relationship with IMC-DMC and/or IMC-Northside.

132.    The United States' damages arising from the Defendants' Stark Law violations consist of all payments by Medicare to IMC-DMC and/or IMC-Northside for claims for DHS services referred by the physicians listed on Exhibit 1 during the date ranges shown for each physician.

133.     The United States' damages arising from Defendants' violation of the Anti-Kickback Statute consist of all payments by Medicare to Defendants for claims for services referred by the physicians listed on Exhibit 1 during the date ranges shown for each physician.

134.     Examples of false claims submitted to Medicare by IMC-DMC during the relevant time period are included as Exhibit 2.

135.     As a result of Defendants' conduct, the Medicare program paid IMC-DMC and IMC-Northside millions of dollars for hundreds of thousands of false and/or fraudulent claims.

### FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))

136.     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

137.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement of DHS that violated the Stark Law.  Defendants also knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for reimbursement by Medicare, for services provided in violation of the Anti-Kickback Statute.

138.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### SECOND CAUSE OF ACTION
**(False Claims Act: Using False Statements to Get False Claims Paid)**
**(31 U.S.C. § 3729(a)(1)(B))**

139. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

140. Defendants made, used, and caused to be made or used, false records or statements — i.e., the false certifications and representations made and caused to be made by DPG, IMC-DMC and IMC-Northside on forms CMS-855I, CMS-855B, and CMS-855R— to get false or fraudulent claims paid and approved by the United States.

141. Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

142. The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

143. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### THIRD CAUSE OF ACTION
**(False Claims Act: False Record Material to Obligation to Pay)**
**(31 U.S.C. § 3729(a)(7) and (a)(1)(G))**

144. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

145. Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

146. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## FOURTH CAUSE OF ACTION
### (Payment by Mistake)

147.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

148.    This is a claim for the recovery of monies paid by the United States to IMC-DMC and IMC-Northside (directly or indirectly) as a result of mistaken understandings of fact.

149.    The United States paid IMC-DMC and IMC-Northside for claims for DHS rendered by physicians who were in a financial relationship prohibited by the Stark Law and/or Anti-Kickback Statute without knowledge of material facts, and under the mistaken belief that IMC-DMC and IMC-Northside were entitled to receive payment for such claims when they were not.  The United States' mistaken belief was material to its decision to pay IMC-DMC and IMC-Northside for such claims.  Accordingly, IMC-DMC, IMC-Northside, DPG, and IHS are liable to make restitution to the United States of the amounts of the payments made in error to them by the United States.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

150.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

151.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

152.    By directly or indirectly obtaining government funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants as follows:

I.      On the First, Second, and Third Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.     On the Fourth and Fifth Counts for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or were paid by mistake, or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

KENYEN R. BROWN
United States Attorney

s/Deidre Colson
DEIDRE COLSON
Assistant United States Attorney
U.S. Attorney's Office for the
Southern District of Alabama
Riverview Plaza
63 S. Royal Street Suite 600
Mobile, AL 36602

MICHAEL D. GRANSTON
TRACY L. HILMER
DOUGLAS ROSENTHAL
KIMBERLY FRIDAY
Attorneys, United States Department of Justice
Civil Division
Post Office Box 261, Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-2073
Fax:  (202) 307-5788

DATED: August 7, 2013