# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. CHRISTIAN M. HEESCH, | ) | |
| | ) | CIVIL ACTION NO. 11-364-KD-B |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DIAGNOSTIC PHYSICIANS GROUP, P.C.; | ) | |
| IMC-DIAGNOSTIC AND MEDICAL, P.C. ; | ) | |
| INFIRMARY MEDICAL CLINICS, P.C.; | ) | |
| and INFIRMARY HEALTH SYSTEM, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANT DIAGNOSTIC PHYSICIANS GROUP, P.C.'S ANSWER TO PLAINTIFF HEESCH'S THIRD AMENDED COMPLAINT

Defendant Diagnostic Physicians Group, P.C. ("DPG") responds to the individually numbered paragraphs in Plaintiff Heesch's Third Amended Complaint as follows:

### INTRODUCTION

1.      The plaintiff CHRISTIAN M. HEESCH as Relator and Plaintiff ("Dr. Heesch") brings this action on behalf of himself, in his individual capacity, against DIAGNOSTIC PHYSICIANS GROUP, P.C. ("DPG"); IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. ("IMC-CLINIC" or "the Clinic"); INFIRMARY MEDICAL CLINICS, P.C. ("IMC"); and INFIRMARY HEALTH SYSTEM, INC. ("IHS"); (sometimes collectively referred herein as "Defendants") for retaliation and wrongful and retaliatory discharge pursuant to the whistleblower retaliation provisions of the FCA, *as amended*, *31 U.S.C. §3730(h)*, as a result of his wrongful termination and discharge by Defendant DPG on July 27, 2011.

**Response:**     Plaintiff's "Introduction" and characterization of his lawsuit does not require a response from DPG other than that DPG denies that it wrongfully discharged or retaliated against Plaintiff.

2.     On July 8, 2011, Dr. Heesch on behalf of the UNITED STATES OF AMERICA ("United States") as Relator filed the initial Complaint against DPG; IMC-CLINIC; IMC; and IHS pursuant to the *qui tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§ 3729-3733* ("FCA") for violations committed by Defendants for violations committed by Defendants and numerous submissions of false and/or fraudulent claims by Defendants for payment to federally-funded Medicare and Medicaid programs as well as other Government Healthcare Programs as a result of referrals that were illegal under the Stark Law (*42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b.*)

**Response:**     DPG admits that the Court's docket shows that Plaintiff filed the initial complaint initiating this action on July 8, 2011, and that such complaint purports to assert causes of action against the Defendants pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").  DPG also notes that the complaint was filed under seal, as required by the FCA.  DPG denies that it committed any violations of the False Claims Act.  DPG further denies that it submitted numerous false and/or fraudulent claims for payment to federally-funded Medicare and Medicaid programs as well as other Government Healthcare Programs as a result of referrals that were illegal under the Stark Law (42 U.S.C. § 1395nn) and Federal Anti-Kickback Laws (42 U.S.C. § 1320a-7b).

3.     Prior to the filing of this Complaint, on May 26, 2011, Dr. Heesch and local counsel, after an extensive and thorough investigation of this matter, met with three (3) Assistant U.S. Attorneys from the U.S. Attorney's Office for the Southern District of Alabama at their office in Mobile, Alabama and disclosed the information the basis of the initial Complaint filed on behalf of the United States by Dr. Heesch as Relator.

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations of paragraph three, and therefore denies the same.

4.      On June 3, 2011, Dr. Heesch through his counsel provided further information to the Government in follow-up to the May 26, 2011 meeting as requested by the United States through Mr. John Cherry, First Assistant, U.S. Attorney. Dr. Heesch summarized the information provided to the United States in the May 26, 2011 meeting and also provided supplemental information that was developed after the meeting due to the continued investigative efforts of Dr. Heesch.

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations of paragraph four, and therefore denies the same.

5.      On July 27, 2011, nineteen days after filing his initial Complaint with this Honorable Court, Dr. Heesch was terminated from his position with Defendant DPG for engaging in protected activities the subject of this Complaint.

**Response:**      DPG admits that on or about July 27, 2011, Plaintiff was terminated from his position with DPG.  DPG denies that Plaintiff was terminated for engaging in protected activities and denies that it was aware of this then-sealed civil action when it terminated Plaintiff from DPG.

6.      On August 7, 2013, the United States filed its Complaint In Intervention which pled, alleged and asserted claims pursuant to the *qui tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§ 3729-3733* ("FCA")) parallel and similar to those which were originally plead, asserted and claimed in Relator's initial and subsequent amended complaints pursuant to the *qui tam* provisions of the FCA. As relator, Dr. Heesch accepts and adopts the Complaint in Intervention of the United States.

**Response:**      DPG admits that on August 7, 2013, the United States filed its Complaint in Intervention.  DPG denies that the allegations and purported claims in the Complaint in Intervention are parallel and similar to those of this Third Amended Complaint.  As fully set forth in DPG's pending motion to dismiss the Complaint in Intervention, and in the briefs supporting that motion,

DPG denies that the Complaint in Intervention states a claim against DPG. DPG further responds that Plaintiff's attempt to adopt and incorporate the Complaint in Intervention is procedurally improper and therefore it requires no substantive response from DPG. To the extent such a response is deemed to be required, DPG adopts and incorporates all arguments, defenses, and authorities DPG has asserted or later asserts in response to the Complaint in Intervention, including all arguments, defenses, and authorities contained within DPG's pending motion to dismiss and the briefs in support of that motion and denies the allegations in this paragraph.

7.      Given the United States' Complaint In Intervention and pursuant the Court's dated October 7, 2013 (Doc. 55), in this his Third Amended Complaint, Dr. Heesch on behalf of himself, individually, does assert his personal claim for wrongful retaliation and retaliatory discharge pursuant to the whistleblower retaliation provisions of the False Claims Act, *as amended*, *31 U.S.C. §3730(h)* for damages and relief personal to him related to retaliation by the Defendants for protected activities engaged in by him, and his wrongful termination and retaliatory discharge and those factual circumstances and allegations related thereto.

**Response:**      The Plaintiff's characterization of his lawsuit does not require a response from DPG other than that DPG denies that it wrongfully discharged or retaliated against Plaintiff.

8.      This Complaint describes Defendants' retaliation, harassment and wrongful termination and discharge as a result of his whistleblowing activities of advising the United States of the Defendants practices of inducing Defendant DPG physicians to make patient referrals in violation of the Prohibited Physician Referral provisions of *42 U.S.C. §1395nn* and the Federal Anti-Kickback provisions of *42 U.S.C. §§1320a-7b* (sometimes referred to as the "Stark Law" and the "Anti-Kickback Law" respectively), and also as a result of his investigative activities which uncovered Defendants' aforementioned illegal activities, investigative activities which date back to 2008.

**Response:**      Denied.

9.      Dr. Heesch was retaliated against, directly and most importantly, because he attempted and succeeded in uncovering through his whistleblowing activities the unlawful practices of the Defendants. These unlawful practices included the provision of excessive compensation and productivity bonuses directly related to each physician's referrals for technological testing performed within the office of IMC-DMC and IMC, which were operated, managed and funded by and through IHS. These productivity or "Stark bonus payments" represented additional financial windfalls to physicians locking in to going back at least to August, 2003, when Dr. Heesch initiated his employment with Defendant DPG as a cardiologist.

**Response:**      Denied.

10.      Dr. Heesch was also retaliated against, in part, because he tried to curb Defendant's illegal activities and practices because they jeopardized patient safety. Specifically, Dr. Heesch attempted to implement safety measures into Defendants' clinical pathways to curb the fraud-motivated pattern of overutilization of highly lucrative medical tests which, in many cases, needlessly exposed patients to ionizing radiation and which were in violation of rules and regulations of the State of Alabama Department of Public Health (herein "Department of Public Health").

**Response:**      Denied.

11.      Dr. Heesch attempted to implement such safety measures into Defendants treatment regime for the patients' benefit and to achieve adherence to Department of Public Safety rules and regulation. However, his efforts were rebuffed and he was retaliated against because, if successful, Dr. Heesch's safety measures would have significantly decreased the Stark "bonus" payments and the excessive and illegal compensation and productivity bonuses directly related to each physician's referral. Dr. Heesch's efforts to bring Defendants into compliance with the Department of Public Health rules and regulations, and the retaliation he experienced impacted on the dollar amounts generated by the Defendants illegal Stark physician self-referrals and therefore relate to his attempts to discover and stop Defendants illegal physician compensation scheme.

**Response:**      DPG admits that it implemented changes to processes related to nuclear testing but DPG denies that any "efforts" by Plaintiff were the reason for the making of those changes and denies all remaining allegations in paragraph eleven.

12.      Due to his whistleblowing activities cited above and alleged in more detail herein, Dr. Heesch was not only retaliated against by the unlawful termination of his employment but this ultimate retaliatory action was preceded by ever increasing levels of harassment and retaliation for his interfering with Defendants physicians illegal compensation scheme, as set out in detail below.

**Response:**      Denied.

## JURISDICTION AND VENUE

13.      The acts proscribed by *31 U.S.C. § 3729 et seq*. and complained of herein occurred in the Southern District of Alabama and Defendants among others, do business in the Southern District of Alabama. Therefore, this Court has subject matter jurisdiction over this case and all Defendants pursuant to *31 U.S.C. 3732(a)*, as well as under *28 U.S.C. § 1345*.

**Response:**      DPG denies that it engaged in acts proscribed by 31 U.S.C. § 3729, *et seq*.  DPG admits it did business in the Southern District of Alabama.  The remaining allegations in paragraph thirteen state legal conclusions, to which no response is required.  To the extent a response to such allegations is deemed required, DPG responds that it lacks sufficient information or knowledge to admit or deny such allegations, and therefore denies the same.

14.      This Court has personal jurisdiction over this matter because Dr. Heesch resides in the Southern District of Alabama and conducts business herein.

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph fourteen, and therefore denies the same.

15.      This Court has personal jurisdiction over all Defendants because all Defendants are located within the Southern District of Alabama and act as the provider of healthcare services and products to Medicare, Medicaid, and TRICARE beneficiaries within the Southern District of

Alabama. Each Defendant regularly performs services and submits claims for payment to Medicare/Medicaid/TRICARE (hereinafter collectively referred to as the "Federal HealthCare Programs") and accordingly is subject to the jurisdiction of this Court.

**Response:**     DPG admits that its physician members provided medical treatment to patients in the Southern District of Alabama, including to some patients who were beneficiaries under federal Medicare, Medicaid, and TRICARE programs.  DPG denies that it submitted claims to the federal government for payment for such medical treatment.  DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph fifteen as they pertain to the other Defendants, and therefore denies the same.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph fifteen, and therefore denies the same.

16.     Venue is proper within the Southern District of Alabama pursuant to *28 U.S.C. §§ 1391 (a) (1)* and *(2)*, because Defendants have offices within the Southern District of Alabama, and have performed numerous acts proscribed by *42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-7b (b)* and *31 U.S.C. §3729, et seq*, within the Southern District of Alabama.

**Response:**     DPG denies that it performed any acts proscribed by 42 U.S.C. § 1395nn, 42 U.S.C. § 1320a-7b (b) and 31 U.S.C. §3729, *et seq.*, whether within or without the Southern District of Alabama.  DPG admits that it used offices within the Southern District of Alabama.  DPG makes no response to the allegations in paragraph sixteen as they pertain to the other Defendants because DPG lacks sufficient information or knowledge to admit or deny such allegations, and therefore denies the same.

**PARTIES**

17.     Relator and Plaintiff, CHRISTIAN M. HEESCH ("Dr. Heesch") resides in the Southern District of Alabama and had been a practicing interventional cardiologist with Defendant DIAGNOSTIC PHYSICIANS GROUP, P.C. ("DPG") from January, 2004 until he was terminated

on July 27, 2011 as a result of his engagement in the protected activities the subject of a Government investigation and subsequent legal action.

**Response:**      DPG admits that Plaintiff practiced as a cardiologist with DPG from January 2004 through his termination on or about July 27, 2011.  DPG denies that Plaintiff was terminated as a result of his "engagement in the protected activities the subject of a Government investigation and subsequent legal action" or otherwise as a result of any protected activities. DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph seventeen, and therefore denies the same.

18.      From January, 2004 through July 27, 2011, Dr. Heesch had been a provider of healthcare services offering outpatient medical care and treatment at the office and clinic operated by DEFENDANTS IMC-DMC and IMC, both of which operate out of the same address at 1700 Springhill Avenue, Mobile, Alabama. He routinely provided healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama.

**Response:**      Upon information and belief, admitted, except that DPG lacks sufficient information or knowledge to admit or deny whether Defendant IMC operated any office and clinic at any address, and therefore denies the same.

19.      Defendant DIAGNOSTIC PHYSICIANS GROUP, P.C. ("DPG") is an Alabama professional corporation that was incorporated on December 21, 1988 with its office located at 1700 Springhill Avenue, and presently employs 71 general and specialty physicians, with the majority being shareholders of DPG. Defendant DPG provides healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama. DPG does not employ any non-physician employees nor does it employ anyone for DEFENDANTS IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. and/or INFIRMARY MEDICAL CLINICS, P.C.

8

**Response:**      DPG admits that it is an Alabama professional corporation that was incorporated on December 21, 1988, that some of its member physicians provided medical services at 1700 Springhill Avenue, in Mobile, Alabama, and that in 2011, DPG had approximately 70 member physicians, the majority of whom were shareholders in DPG.  DPG admits that its member physicians provided healthcare services, including the ordering of technology testing and diagnostic measures, for patients who were beneficiaries of federal healthcare programs including Medicare and Medicaid. DPG admits that it does not employ anyone "for" the other Defendants.  DPG denies that it did not employ any non-physicians.

20.      Defendant IMC-DIAGNOSTIC AND MEDICAL CLINIC, P.C. ("IMC-DMC" or "the Clinic") is an Alabama professional corporation that was incorporated on January 3, 1990 and is a wholly-owned subsidiary of Defendant INFIRMARY MEDICAL CLINICS, P.C. located at 1700 Springhill Avenue and provides healthcare services, including the ordering of technology testing and diagnostic measures, for patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama.

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph twenty, and therefore denies the same.

21.      Defendant INFIRMARY MEDICAL CLINICS, P.C. ("IMC") is an Alabama Non-Profit Corporation that was incorporated on August 22, 1988 and purportedly qualified as an exempt organization pursuant to *Section 501 (c) (3)* of the Internal Revenue Code. IMC is the holding company of D & M CLINIC, which it operates, manages and funds. Defendant IMC also operates manages and funds fourteen (14) or more other clinic subsidiaries with twenty-five (25) or more locations in whole or in part in the Southern District of Alabama.

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph twenty-one, and therefore denies the same.

22.     Defendants IMC-DMC and IMC provide office space, facilities and equipment and any expansion or improvement office space, facilities and equipment; furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services for and to Defendant DPG for less than fair market value. IMC-DMC is solely operated, managed and funded by Defendants IMC and IHS.

**Response:**     DPG admits that IMC-DMC and/or IMC provided office space, facilities and equipment, furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services for and to DPG.  DPG denies that IMC-DMC and/or IMC provided DPG with any goods or services for less than fair market value.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph twenty-two, and therefore denies the same.

23.     Defendants IMC and IMC-DMC provide office space, facilities and equipment and any expansion or improvement office space, facilities and equipment; furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services for and to Defendant DPG for less than fair market value. All capital equipment purchases for IMC-DMC must receive approval from administrators of Defendants IMC and IHS. IMC through IHS employs and compensates all non-physician employees and the administrative staff of the Clinic some of whom services is billable to Federal HealthCare Programs. IMC is a parent and alter ego of, and acts through various healthcare subsidiaries, including IMC-DMC, and provides management, financial and reimbursement services for all such subsidiaries and channels funds from such subdivisions to itself and to Defendants DPG, IMC-DMC and IHS.

**Response:**     DPG admits that IMC-DMC and/or IMC provided office space, facilities and equipment, furniture, medical supplies, office supplies, copy and fax machines, telephone, housekeeping services, laundry services, utility and transcription services for and to DPG.  DPG denies that IMC-DMC and/or IMC provided DPG with any goods or services for less than fair

10

market value.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph twenty-three, and therefore denies the same.

24.      Defendant INFIRMARY HEALTH SYSTEM, INC. ("IHS") is a healthcare management company engaged in the business of owning and operating acute care hospitals, including Mobile Infirmary Association d/b/a Mobile Infirmary Medical Center ("Mobile Infirmary"), rehabilitation hospitals, outpatient facilities , twenty-eight (28) or more medical clinics, including Defendants IMC and IMC-DMC, and other healthcare services to more than 600,000 residents along the Gulf Coast of Alabama, Mississippi and Florida including patients who are beneficiaries of Federal HealthCare Programs within the Southern District of Alabama. It is an Alabama Non-Profit Corporation that was incorporated on November 23, 1982 and purportedly qualified as an exempt organization pursuant to *Section 501 (c) (3)* of the Internal Revenue Code. It is headquartered in Mobile, Alabama. IHS is the parent company to Defendant IMC and is integrally involved in the unlawful compensation scheme engaged in by Defendants DPG, IMC-DMC and IMC, in violation of the Stark and Anti- Kickback laws, as described herein. As such, any allegation herein against any Defendant is intended to include IHS as a responsible party.

**Response:**      DPG denies that it engaged in an unlawful compensation scheme in violation of the Stark and/or Anti-Kickback laws.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph twenty-four, and therefore denies the same.

25.      All Defendants are health care providers and suppliers who participate in Federal HealthCare Programs.

**Response:**      DPG admits that its member physicians provided medical care to patients, some of whom were patients who were beneficiaries under the federal Medicare and Medicaid programs and that some or all of such physicians were enrolled as suppliers under the federal Medicare program and under the Alabama Medicaid program.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations of paragraph twenty-five, and therefore denies the same.

## FEDERAL HEALTHCARE PROGRAMS

### The Medicare and Medicaid Programs

26.     Title XVIII of the Social Security Act, *42 U.S.C. §§ 1395, et seq*., established the Health Insurance for the Aged and Disabled, popularly known as the Medicare program. The United States Department of Health and Human Services ("DHHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. CMS is authorized to enter into and administer contracts with insurance companies or Medicare contractors on behalf of DHHS. Inclusive in CMS's contracting authority is the responsibility for entering into contracts with health care providers and suppliers.

**Response:**     Paragraph twenty-six asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph twenty-six, and therefore denies the same.

27.     CMS enters into contracts and pays for health care services provided to Medicare beneficiaries through insurance companies acting as Medicare ("fiscal intermediaries") contractors with the responsibility to process and pay health care claims under Medicare Part A which covers hospital and post-hospitalization services. *42 U.S.C. §§ 1395c-1395i-2 (1992)*. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (usually 80 percent) of the fee schedule amount for physician and laboratory services *42 U.S.C. §§ 1395k, 1395l, 1395x(s)*, outpatient services and all other services not covered by Medicare Part A. Medicare Part B contractors ("carriers") process and pay claims for these services.

**Response:**     Paragraph twenty-seven asserts legal conclusions, to which no response is required. To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph twenty-seven, and therefore denies the same.

28.     Defendants submitted or caused to be submitted fraudulent claims to the United States through several Medicare Part B contractors in and around the Southern District of Alabama which Dr. Heesch alleged, asserted and complained of in his initial Complaint.

**Response:**     Denied as to DPG.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph twenty-eight as to the other defendants, and therefore denies the same.

29.     Government Healthcare Programs depend on physicians and other health care professionals to exercise independent judgment in the best interests of patients. Financial incentives tied to referrals have a tendency to corrupt the health care delivery system in ways that harm the federal programs and their beneficiaries. Corruption of medical decision-making can result when a physician refers a patient to a provider on the basis of the physician's financial self-interest instead of the patient's best interests.

**Response:**     Paragraph twenty-nine asserts legal conclusions, to which no response is required. To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph twenty-nine, and therefore denies the same.

**Defendants' Participation in Federal HealthCare Programs**

30.     By way of example of such participation and payments in Federal HealthCare Plans by Defendants, Relator reportedly had total charges of *$1,840,268* for the 1st and 2nd Quarters of 2009, one of the years the subject of this action, with the Medicare per centage of the charges being 63.46% and the Medicaid per centage of charges being 1.36%. For the 1st and 2nd Quarters of 2010, Relator reportedly had total charges of *$1,835,898*, again one of the years the subject of this action, with the Medicare per centage of the charges being 66.42% and Medicaid per centage of charges being 3.16 %.

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph thirty, and therefore denies the same.

31.     By way of further illustration of such participation and payments in Federal HealthCare Plans by Defendants, Relator had total charges of *$1,076.269.00* for January through March of 2007 (1st Quarter, 2007), one of the years in question hereunder, and for that period reported a payor mix for Relator alone that included 45.98% Medicare claims, 2.78% Medicaid, 0.28% TRICARE, and 0.03% TRICARE PR.

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph thirty-one, and therefore denies the same.

32.     As a condition of their participation in these Federal HealthCare Programs, Defendants are responsible for compliance with the legal and proper billing and reimbursement rules required by these programs. This responsibility is both stated and implied throughout various claim forms, conditions of participation, and Medicare and Medicaid program participation documents, all of which contain certifications of truth and accuracy which are signed by the provider or its authorized representative(s) and submitted to the above referenced Federal HealthCare Programs for payment.

**Response:**     Paragraph thirty-two asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that it denies any purported implied responsibilities and denies it submitted claims to the federal government under Medicare or Medicaid, and DPG lacks sufficient information or knowledge to admit or deny the remaining allegations, and therefore denies the same.

<u>**APPLICABLE LAW**</u>
<u>**THE SUBJECT OF DR. HEESCH'S COMPLAINTS**</u>

33.     *Section 3729* of The False Claims Act ("FCA") provides in pertinent part and imposes liability on any person or entity who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
* * * * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

*31 U.S.C. § 3729(a) (1)-(3).*

**Response:**      Paragraph thirty-three asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

34.      Falsely certifying compliance with the Stark and Anti-Kickback Laws in connection with a claim submitted to a federally funded insurance program is actionable under the FCA. *United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88 (3rd Cir. 2009) (citations omitted); United State ex rel. Repko v. Guthrie Clinic, 557 F. Supp. 522 (M.D. Penn., 2008) (citations omitted).*

**Response:**      Paragraph thirty-four asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph thirty-four, and therefore denies the same.

35.      The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. See *S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted* in *1986 U.S.C.C.A. 5266).*

**Response:**      Paragraph thirty-five asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph thirty-five, and therefore denies the same.

**Stark Law (Physicians Self-Referral Law)**

36.     The "Stark" statute, *42 U.S.C. §1395nn,* is also known the Physician Self-Referral statute. *42 U.S.C. §1395nn* (herein "Stark")*,* prohibits physicians from making a referral to an entity for the furnishing of designated health services, if a physician has a direct or indirect financial relationship (ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS") Stark also prohibits entities from billing for services provided pursuant to a prohibited referral. If a financial relationship exists, all referrals and associated claims are illegal unless specifically exempted by statute. *42 U.S.C. § 1395nn (a) (1) (A) and (B).* In other words, the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to CMS for such DHS unless the financial relationship fits in a statutory or regulatory exception.

**Response:**     Paragraph thirty-six asserts legal conclusions, to which no response is required. To the extent a response is deemed to be required, DPG answers that it lacks sufficient information or knowledge to admit or deny the allegations in paragraph thirty-six.

37.     Liability under Stark involves three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; and (3) none of the Stark exceptions apply.

**Response:**     Paragraph thirty-seven asserts legal conclusions, to which no response is required. To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

38.     Under Stark, a physician has a "financial relationship" with an entity if he has either "an ownership or investment interest in the entity" or "a compensation arrangement" with it. *42 U.S.C. §1395nn (a) (2).*  An ownership or investment interest in the entity may be an equity interest, a debt relationship or indirect ownership through controlling entities.

**Response:**     Paragraph thirty-eight asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

39.     A "compensation arrangement" consists, in pertinent part of "any arrangement involving remuneration between a physician . . . and an entity . . . ." *43 U.S.C. § 1395nn (h) (1) (A)*. "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *43 U.S.C. § 1395nn (h) (1) (B)*.

**Response:**     Paragraph thirty-nine asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

40.     Stark defines "referral" as "the request by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician)." *43 U.S.C. § 1395nn (h) (5) (A)*.

**Response:**     Paragraph forty asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

41.      Once the Plaintiff or government establishes proof of each element of a violation of Stark, the burden shifts to the defendant to establish the conduct was protected by an exception. *United States ex rel. Kosenske v. Carlisle HMA, Inc., at 95 (citation omitted)*.

**Response:**     Paragraph forty-one asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

42.      In contrast to the Federal Anti-Kickback Statute, Stark is only a civil prohibition. Stark is not a crime. Stark is a strict liability statute that is violated whenever a prohibited referral is

made or a prohibited claim is submitted, regardless of whether the health care provider intended, knew or should have known that the law prohibited the actions it took.

**Response:**      Paragraph forty-two asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

**Anti-Kickback Law**

43.      The Federal Anti-Kickback Act ("Anti-Kickback") makes it a crime to knowingly and willfully offer, pay, solicit or receive **any remuneration** to induce a person:

(1)       to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

(2)       to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

*42 U.S.C. §1320a-7b (b) (1) and (2).*

**Response:**      Paragraph forty-three asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

44.      The term "**any remuneration**" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. *42 U.S.C. §1320a-7b(c) (1).* Any ownership interest or compensation arrangement that constitutes a financial relationship under Stark would also constitute remuneration as defined by Anti-Kickback, unless a kickback safe harbor applies.

**Response:**      Paragraph forty-four asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

45.      Knowing and willful conduct is a necessary element of this criminal offense. *42 U.S.C. §1320a-7b (b) (1).* An act is willful if "the act was committed voluntarily and purposely, with

18

the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v Stacks*, 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any arrangement where *one* purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v Greber,* 760 F.2d 68 (3d Cir.), *cert denied*, 474 U.S. 988 (1985).

**Response:**     Paragraph forty-five asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

46.     HHS has published safe harbor regulations that define practices that are not subject to Anti-Kickback because such practices would unlikely result in fraud or abuse. *See 42 C.F.R. §1001.952*. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

**Response:**     Paragraph forty-six asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

47.     Stark and Anti-Kickback laws prohibit payment by the United States for Medicare, Medicaid and other Government HealthCare Program services provided from illegal physician referrals of these patient beneficiaries or in exchange for kickbacks or payments to the referring physician or entity, and prohibit referrals by physicians to providers with which the referring physician(s) have a financial relationship, and payment by Medicare or Medicaid for goods or services resulting from a prohibited such a referral.

**Response:**      Paragraph forty-seven asserts legal conclusions, to which no response is required.  To the extent a response is deemed to be required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

<strong>ALLEGATIONS</strong>

48.      Paragraphs 1 through 47 above are adopted and incorporated as if fully set forth herein.

**Response:**      DPG incorporates its responses to paragraphs one through forty-seven as if fully set forth here.

49.      Dr. Heesch witnessed and was an unwitting participant in what he ultimately learned to be a fraudulent compensation scheme whereby proceeds derived from technology fees ("Stark Payments") were allocated to DPG physicians based upon and related to the number of patient referrals DPG physicians made to Defendants (in particular IMC-DMC and IMC) which thereby induced DPG physicians to make patient referrals in violation of Stark and Anti-Kickback, respectively, to Defendants. This fraudulent scheme resulted in false certifications of compliance, thereby tainting all resulting claims submitted to Government HealthCare Programs from at least January, 2004 inclusive to at a minimum the time of Dr. Heesch's wrongful discharge.

**Response:**      Denied.

50.      This scheme encouraged and resulted in the intentional and significant overuse of medical tests, many of which were unnecessary, and as a consequence, Defendants collected and shared in the reimbursement of several million dollars annually for tests that were not medically necessary. A large number of these tests involved the administration of radioactive substances (nuclear imaging studies) and thereby knowingly exposed Defendants' patients to substantial risks of harm including the unnecessary risk of cancer.

**Response:**      Denied.

51.     Further, Defendants officers, administrators, and individual physicians, despite full knowledge of the substantial risk to patients, successfully inflated the number of nuclear imaging studies (which expose patients to substantial amounts of radiation) performed to generate technology fees and additional compensation for the DPG physicians by:

-        Noncompliance with the State of Alabama patient protection mandates regarding the use of radioactive substances;

-        Noncompliance with institutional patient protection guidelines; and

-        Outright falsification of medical records.

**Response:**     Denied.

52.     From at least August, 2003, at the time when Dr. Heesch met with DPG and DMC officials to discuss his possible employment, until the time of his termination, Dr. Heesch repeatedly inquired, questioned and ultimately confronted the Defendants on whether they were collectively engaged in illegal financial relationships by paying remuneration to physicians in violation of Stark laws and other federal laws by unlawfully accepting physicians' patient referrals, then unlawfully billing Medicare, Medicaid, TRICARE and other Government healthcare programs for designated health services rendered to those patients. Despite Dr. Heesch's complaints and inquiries, Defendants knowingly paid remuneration to the physicians with the expectation they would derive a greater benefit from patient referrals and took into account the value and volume of referrals in making "bonus" Stark payments to DPG physicians.

**Response:**     Denied.

53.      Dating back to 2006, Dr. Heesch voiced complaints to Defendant DPG of the excessive ordering of nuclear imaging tests (nuclear stress tests) by DPG physicians, many of which were not medically necessary and in fact, subjected patients to unnecessary danger through radiation exposure. However, his complaints were ignored because these tests resulted in increased "bonus" Stark payments to DPG physicians.

**Response:**     DGP admits that Plaintiff was involved in an inquiry into DPG's process and procedures related to nuclear tests.  DPG denies all remaining allegations in paragraph fifty-three.

54.     Specifically, when Dr. Heesch succeeded in temporarily implementing institutional guidelines to achieve adherence to sound clinical guidelines and radiation safety standards, Barre Sanders ("Sanders"), Administrator of Defendants, promptly reported to Dr. Heesch's colleagues in a formal DPG physician meeting that there had been a decline in reimbursement "thanks to Dr. Heesch", implying that Dr. Heesch's efforts had an adverse impact on DPG physicians financial interests. Dr. Heesch's safety guidelines were subsequently circumvented by DPG, led by F. Martin Lester, M.D. ("Lester"), President of DPG, and administrator Sanders.

**Response:**     Denied.

55.     Specifically, when Dr. Heesch identified multiple incidents of unnecessary radiation testing that had been 'justified' based on outright medical record falsification, and when Dr. Heesch sent a collection of such falsified records to Lester and Sanders, DPG leadership discouraged Dr. Heesch from voicing such concerns and labeled him "un-collegial" and "disruptive".

**Response:**     Denied.

56.      Further, and in direct response to Dr. Heesch's attempts to achieve compliance with Alabama State law on radiation safety, to improve standards of care in general, and to curb such patient care abuses which were a direct result of Defendants illegal financial scheming, Dr. Heesch was made the subject of targeted harassment, intimidation and retaliation campaign implemented by DPG leadership.

**Response:**     Denied.

57.     Specifically, Dr. Heesch tried to ensure that even unnecessarily ordered tests were appropriately followed up by the referring DPG physician but was retaliated against for carrying out his medical obligations. For example, when Dr. Heesch issued written test reports for a patient of Lester's and indicated the patient needed follow up treatment for abnormal results, Lester would

adorn these reports (actual medical records, copies of which have been provided to the United States) issued by Dr. Heesch with hand-written comments such as *"pure BS", "For Dr. Heesch's Bath Room", "Wipe Thoroughly!", "Toilet Paper Please Wash Hands after use".* Dr. Heesch's written complaints about such bullying and retaliation were ignored, yet, DPG leadership knew and acknowledged that Lester was a bully.

**Response:**     DPG denies that Plaintiff was bullied or retaliated against.   DPG denies that medically unnecessary tests were ordered.   DPG admits that Plaintiff made written remarks about incidents involving Dr. Lester but denies Plaintiff's characterization of those incidents and denies that Plaintiff's remarks were ignored.   DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph fifty-seven, and therefore denies the same.

58.   DPG's culture of putting profits and bonuses ahead of patient care and safety also led to Dr. Heesch repeatedly becoming a victim of workplace harassment whenever his actions interfered with Defendants' scheming.

**Response:**     Denied.

59.   Repeatedly, his efforts to ensure patient safety were met with outright vulgarity, screaming tirades and the shouting of profanities, preferably "F _ _ _ you!" (expletive deleted). The most prominent actors in such workplace harassment were two DPG physicians with harassment records, one of whom, confessed to Dr. Heesch that he had been mandated in the past to attend a specialized sexual behavior reform school in Atlanta, GA. Neither of the aforementioned DPG physicians were terminated for their conduct.

**Response:**     DPG denies that Plaintiff made any efforts to ensure patient safety that were met with "outright vulgarity, screaming tirades, and/or the shouting of profanities."   DPG admits that Plaintiff used vulgarity in the workplace, including the expletive identified in paragraph fifty-nine.   DPG admits that there were DPG physicians who were involved in issues arguably related to alleged harassment, but those issues did not relate to the alleged harassment of Plaintiff and DPG denies that

23

Plaintiff or any other DPG employee was harassed.  DPG lacks sufficient information or knowledge

to admit or deny the remaining allegations in paragraph fifty-nine, and therefore denies the same.

60.     Dr. Heesch, who profoundly abhors screaming and vulgarity, complained to DPG

leadership repeatedly and in writing (records provided to the United States) about such harassment in

response to his patient care initiatives. His requests were ignored.

**Response:**     DPG denies that Plaintiff was harassed and denies that Plaintiff abhors profanity.

DPG admits that Plaintiff submitted written statements about vulgarity but denies that such

statements were ignored.  DPG lacks sufficient information or knowledge to admit or deny the

remaining allegations in paragraph sixty, and therefore denies the same.

61.     Whenever Dr. Heesch engaged in activities designed to enhance patient safety but

potentially interfering with Defendants' illegal compensation scheme, he was retaliated against by

Lester and Defendants.

**Response:**     Denied.

62.      Despite Dr. Heesch's inquiries and objections, Defendant DPG continued to receive

remuneration from Defendants IMC-DMC, IMC, and IHS for referring patients to them for

technology services which generated Stark payments. Further, Defendants IMC-DMC, IMC, and IHS

continued to bill for services furnished pursuant to these prohibited referrals with knowledge of the

illegality of such self-referrals and kickbacks billed to and paid from Government HealthCare

Programs.

**Response:**     DPG admits that it received payment pursuant to its Professional Services Agreement

with IMC-DMC through December 31, 2011.  DPG denies the remaining allegations in paragraph

sixty-two.

<u>**CAUSE OF ACTION**</u>

<u>**(Retaliatory Conduct and Discharge – Whistleblower Retaliation)**</u>
<u>*31 U.S.C. § 3730 (h)*</u>

63.     Plaintiff and Relator realleges and incorporates by reference paragraphs 1 through 62 as though fully set forth herein.

**Response:**     DPG incorporates its responses to paragraphs one through sixty-three as if fully stated here.

64.     From the beginning his cardiology practice with the Defendants and throughout his employment and to present, Dr. Heesch was and is a licensed physician. He held and holds board certifications in the areas of Internal Medicine, Cardiovascular Diseases, and Interventional Cardiology. Dr. Heesch further passed Board Examinations in Nuclear Cardiology and Echocardiography. Dr. Heesch's work focused on interventional cardiology and peripheral endovascular procedures (catheter based techniques to improve heart and blood vessel diseases), nuclear cardiology and cardiac and peripheral vascular ultrasonography.

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph sixty-four that address Plaintiff's licensure or board certification status for any time period after his termination with DPG, and therefore denies the same.  As to the remaining allegations in paragraph sixty-four, upon information and belief, admitted.

65.     On August 18, 2003, Dr. Heesch signed his Employment Agreement with Defendant DPG and began his medicine practice with the Defendants in January, 2004. At and about the time of his employment, DPG and its administrators, including R. Barre Sanders, explained to Dr. Heesch how a component of his compensation, not contained in his Employment Agreement, included a per centage of "Stark Law" compensation. Their explanations included handwritten notes to that effect. Dr. Heesch, at the time, had no reason to believe that any of these arrangements were illegal.

**Response:**     DPG denies that its compensation arrangement was illegal and denies that it was not contained in Plaintiff's Employment Agreement.   DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph sixty-five, and therefore denies the same.

25

66.     Dr. Heesch began his medicine practice with Defendant DPG and at the clinics and hospitals of Defendants IMC-DMC, IMC, and IHS in January, 2004, first as a Physician-Employee and two (2) years later on February 3, 3006, became a shareholder of Defendant DPG. Dr. Heesch continuously practiced medicine with Defendants from January, 2004 until he was terminated on July 27, 2011, nearly eight (8) years.

**Response:**     Upon information and belief, admitted.

67.     Dr. Heesch made repeated inquiry of Defendant DPG officers and directors regarding the nature and legality of Defendants compensation methodology, including Stark violations, and made efforts to investigate and uncover same, including efforts to hire his own accountant to conduct such an inquiry. These efforts were rebuffed by Defendants.

**Response:**     DPG admits that Plaintiff made inquiries regarding the nature of DPG's compensation arrangements, and admits that Plaintiff hired his own accountant to conduct an inquiry. DPG denies that Plaintiff's inquiries made any mention of, or had any relation to, the issue of compliance with the Stark or Anti-Kickback laws.  Except as expressly admitted, DPG denies the allegations in paragraph sixty-seven.

68.     In particular, at the November, 2008, monthly DPG physician meeting, Dr. Fritz LaCour, a neurologist who had recently joined DPG, requested that an audit of DPG's finances be done by an outside firm. Given the fact that Dr. Heesch had his own concerns regarding nature and legality of the DPG's physician reimbursement arrangement, Dr. Heesch expressed his support of an outside, independent audit to examine the issue of Defendant DPG's physicians' compensation methodology, including the "Stark payments". During that November, 2008 meeting, Dr. Heesch (and Dr. LaCour) were screamed down by Lester, whose tirade included calling Dr. Heesch a 'blockhead' for insisting on financial transparency, and then Lester vetoed any independent financial audit of DPG. Lester then added that he himself would arrange for an audit.

**Response:**      DPG admits that an audit was discussed at the November, 2008, monthly DPG physician meeting, and admits that the possibility of conducting a financial audit was supported by, among others, Dr. Fritz LaCour and Plaintiff.  DPG denies that the discussion of an audit included any mention of, or had any relation to, the issue of compliance with the Stark or Anti-Kickback laws. DPG admits that there were confrontational remarks exchanged at the meeting, including inappropriately disruptive and belligerent remarks by Plaintiff.   DPG denies that the remarks included any mention of, or had any relation to, the issue of compliance with the Stark or Anti-Kickback laws.  DPG denies that Dr. Lester vetoed the option of conducting an independent financial audit of DPG's finances and states rather that Dr. Lester approved and ordered an audit.   Except as expressly admitted, DPG denies the allegations in paragraph sixty-eight.

69.      The day after Dr. Heesch supported an independent audit, he was contacted via telephone by Lester who told him that if he ever again asked for a private audit, he (Lester) would fire Dr. Heesch.

**Response:**      Denied.

70.    Several days later, Dr. Heesch received a letter, signed by the members of DPG's group of directors, in which he was given a "final, written warning" directly relating to his support for an independent audit, and threatened with " … disciplinary action up to and including termination". Dr. LaCour also received such a letter from DPG's Board. In response (according to statements subsequently made by Lester), Dr. LaCour wrote a letter the next day "…apologizing and saying that he realized he was out of line and he wanted to be part of the deal." Dr. Heesch refused to apologize for suggesting a financial audit.

**Response:**      DPG admits that letters were issued to Plaintiff and Dr. LaCour addressing the remarks they made at the November 2008 meeting, and admits that Dr. LaCour submitted a response letter.  DPG denies that the letters included any mention of, or had any relation to, the issue of

compliance with the Stark or Anti-Kickback laws.   Except as expressly admitted, DPG denies the allegations in paragraph seventy.

71.    In an apparent response to the request for an audit, Lester and DPG further arranged for a meeting behind closed doors at the end of November, 2008, in which DPG's CFO, Dr. William Gewin, was to reveal DPG's physician reimbursement formula. Attendants, including Dr. Heesch, were instructed to keep the information secret.

**Response:**    DPG admits that there was a regular meeting, not one "behind closed doors," conducted in November 2008 during which Dr. Gewin offered remarks in explanation of the compensation arrangement.   DPG denies that attendants were instructed to keep the compensation formula secret.   Except as expressly admitted, DPG denies the remaining allegations in paragraph seventy-one.

72.    In that meeting, Dr. Gewin disclosed that DPG's leadership, in conjunction with the Mobile Infirmary,[one of the hospitals owned and operated by Defendant IHS], had a compensation arrangement with DPG, whereby DPG physicians ordering tests received a financial reward commensurate with the number and cost of the tests ordered by DPG shareholder physicians. The more tests, and the more expensive tests, the more money went back to the physician ordering the test(s). Dr. Gewin further revealed that the 'Stark laws' prohibited such an arrangement, and that, in order to prevent its discovery by auditors, a number of measures had been put in place to make the system non-obvious. These measures, as outlined by Dr. Gewin, included a delay between the time a physician ordered a test and the time he/she was rewarded for the order, the distribution of a small amount of moneys evenly between all physicians, and a randomness factor annually determined for each physician by Lester himself. Dr. Gewin concluded his explanations with a reiteration of the need to keep the knowledge of this arrangement secret, because "… it could be illegal."

**Response:**    Denied.

73.     Alarmed, Dr. Heesch approached both Lester and Sanders about these revelations, and was told by both that DPG's physician reimbursement scheme was not illegal. Given these assurances, and given the threats he himself had faced when trying to arrange for an audit on his own, Dr. Heesch kept quiet, but a nagging suspicion and concern remained.

**Response:**     DPG lacks sufficient information or knowledge to know what supposed suspicions and concerns Plaintiff may have had, and therefore denies the same.  DPG denies that Plaintiff approached Dr. Lester and/or Barre Sanders regarding any remarks Dr. Gewin made in November 2008, denies that Dr. Gewin made the remarks that Plaintiff was allegedly "alarmed" about (i.e., the statements described in paragraph seventy-two), and denies all remaining allegations in paragraph seventy-three.

74.     Several weeks later at the end of 2008, while conducting his morning clinic and seeing patients, Dr. Heesch was brought into a conference room and left alone with two (2) gentlemen who had been retained by Defendant DPG and purportedly were conducting the promised "independent" audit on Defendants' financials.

**Response:**     DPG admits that it conducted a voluntary audit but lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph seventy-four, and therefore denies the same.

75.     Dr. Heesch advised the auditors that he had numerous concerns about the legality of the distribution of income that went to physicians' compensation and that several DPG physicians, including himself, had expressed a desire to be informed of the methodology by which DPG physicians' total compensation was being calculated. Dr. Heesch was told by the auditors right then and there that it had been expressly requested by DPG leadership ordering the audit that physician compensation methodology not be looked into. In keeping with that, the subsequently issued prepared and circulated audit did not address the DPG physician total compensation methodology.

**Response:**      DPG denies that it told the auditors to not look into the physician compensation methodology.  DPG denies that Plaintiff raised concerns about the legality of the distribution of income at DPG in 2008.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations of paragraph seventy-five, and therefore denies the same.

76.      In April, 2011, comments made at a DPG shareholder meeting which Dr. Heesch did not attend, but about which he heard from other DPG physicians, together with the aforementioned comments made in November, 2008 by William C. Gewin, M.D., treasurer of Defendant DPG, cautioning DPG physicians from disclosing the Stark compensation methodology in public because "it could be illegal", in part, motivated Dr. Heesch to seek legal counsel and initiate the investigation resulting in his Complaints and subsequently, the United States Complaint In Intervention.

 **Response:**      DPG denies that Dr. Gewin made the "aforementioned comments" in the November 2008 meeting and denies that Dr. Gewin cautioned DPG physicians from disclosing Stark compensation methodology in public on grounds that it could be illegal.  DPG lacks sufficient information or knowledge to admit or deny whether "other DPG physicians" did or did not make some undisclosed comments to Plaintiff and what effect, if any, such alleged comments may have had on Plaintiff's motivation to seek legal counsel, and therefore denies the same.

77.      Until April, 2011, therefore, Dr. Heesch had, at best imprecise and contradictory information regarding the legality of the compensation methodology, with the majority of DPG's leadership representing that no violations of the law had ever occurred. Dr. Heesch's further attempts to learn of the methodology of how he and other DPG shareholders were compensated were stopped by the Defendant DPG's leadership, and he was "strong-armed" to not pursue any further inquiry.

**Response:**      DPG denies that Plaintiff's inquiries into DPG's compensation arrangement related to legality and compliance with the Stark and/or Anti-Kickback laws.  DPG denies that it "strong-armed" or otherwise thwarted any effort to learn about the compensation arrangement.  DPG further denies that its compensation arrangement violated any law.  DPG lacks sufficient information or

knowledge to admit or deny the remaining allegations of paragraph seventy-seven, and therefore denies the same.

78.    Given his previous concerns regarding Defendant DPG's physicians' compensation methodology, including the "Stark payments", and given the new, highly alarming information brought to him in April, 2011, Dr. Heesch brought his knowledge and information to the attention of the United States in a meeting which occurred on May 16, 2011.

**Response:**    DPG lacks sufficient information or knowledge to admit or deny whether Plaintiff brought some undisclosed information to the attention of the government or when he did so, and therefore denies the same.  As to the remaining allegations in paragraph seventy-eight, denied.

79.    As Dr. Heesch continued to investigate the legality of the of Defendants compensation methodology, including Stark payments based on patient referrals, Defendants greatly increased their acts of retaliation and intimidation against him because of lawful acts undertaken by him in the furtherance of an action under the FCA. As described above, those acts had begun much earlier and had tracked and mirrored Dr. Heesch's attempts to achieve compliance with the law.

**Response:**    Denied.

80.    On June 9, 2011, Dr. Heesch submitted a letter to Defendant DPG seeking to examine and inspect the records of Defendants DPG ("the Group" for purposes of this paragraph) and IMC-DMC ("Diagnostic & Medical" for purposes of this paragraph) for the following stated purposes:

- to determine the medical billings and collection amounts on procedures and services rendered by Dr. Heesch;
- to ascertain the distribution of monies coming into the Group[DPG] and/or Diagnostic & Medical [the Clinic] to Dr. Heesch and other doctors and shareholders;
- to ascertain the formula used in distribution of the monies to the shareholders of the Group;
- to determine how monies for technical fees are distributed to the shareholders of the Group and others ;
- to discover how "pool monies" for other procedures are distributed to the shareholders of the Group including determining the formula used in the distribution of these funds ;
- to determine what payments if any to the Group which come from Infirmary Health Systems [IHS] &/or Mobile Infirmary Medical Center;

- to discover what payments if any are made to Infirmary Health Systems &/or Mobile Infirmary Medical Center from the Group;
- to learn what payments if any made from the Group to IMC – Diagnostic and Medical, P.C.; and
- to learn what payments if any are made to IMC – Diagnostic and Medical from the Group.

The June 9, 2011 communications on behalf of Dr. Heesch also included a letter from forensic accountant, Mr. Jeff Windham, of Forensics Strategic Solutions, P.C. requesting specific documents and records regarding DPG's physician compensation arrangements set out in twenty numbered paragraphs of Mr. Windham's letter.

**Response:**      DPG admits that it received a letter from Plaintiff requesting access to records and a letter from Mr. Windham also requesting access to records.  Those letters speak for themselves, and DPG denies Plaintiff's allegations to the extent they seek to mischaracterize such letters.  DPG denies the remaining allegations in paragraph eighty.

81.      On the same date of the letter, June 9, 2011, **and less than one (1) hour after the letter** containing the above request for documents and records was received by Sanders, (Administrator of Defendants whose office was/is next to Lester's office), Dr. Heesch received a handwritten note from Lester stating as follows:

> *Chris:*
> *Monday The Board of Directors are Meeting Your relationship c̄ our office is to be discussed. You have made no effort to address this. I assume you are*
> *Leaving*
> *Martin*

**Response:**      DPG admits that Dr. Lester's and Mr. Sander's offices are adjacent.  DPG admits that on or about June 9, 2011, Dr. Lester wrote a handwritten note to Dr. Heesch.  That letter speaks for itself.  DPG denies Plaintiff's mischaracterization of the letter as a response to Plaintiff's records request and denies the remaining allegations in paragraph eighty-one.

82.     On June 13, 2011, Dr. Heesch, through counsel, wrote Defense Counsel for Defendant DPG in an effort to expedite the production of documents requested in the June 9, 2011 letter, and specifically stated and requested:

* * * * * * *

1.     records and documents related to total compensation for physicians of
       the Group[DPG] from 2004 up and through 2010;
2.      records and documents related bonus payments to physicians of
       the Group from 2004 up and through 2010;
3.     records and documents related professional charges and collections for physicians of
       the Group from 2004 up and through 2010;
4.     records and documents reflecting each physician's share of the Stark
       Pool collections (total amount and per centage of total collections) for 2004 up and
       through 2010;
5.     records and documents reflecting total Stark collections of the Group
       and specific allocation of collections to each doctor based on tests ordered but not
       performed by each physician from 2004 up and through 2010.

* * * * * * *

**Response:**     DPG received a letter from Plaintiff's counsel regarding the records request.  That letter speaks for itself.  DPG denies Plaintiff's allegations to the extent they seek to mischaracterize that letter.  DPG lacks sufficient information or knowledge to admit or deny the reason for such letter, and therefore denies the same.

83.     On July 8, 2011, Dr. Heesch on behalf of the United States as Relator filed the initial Complaint against Defendants, **UNDER SEAL,** pursuant to the *qui tam* provisions of the False Claims Act, *as amended*, *31 U.S.C. §§ 3729-3733* ("FCA") for violations committed by Defendants for violations committed by Defendants and numerous submissions of false and/or fraudulent claims by Defendants for payment to federally-funded Medicare and Medicaid programs as well as other Government Healthcare Programs as a result of referrals that were illegal under the Stark Law ( *42 U.S.C. § 1395nn*) and Federal Anti-Kickback Laws (*42 U.S.C. § 1320a-7b).*

**Response:**     The Plaintiff's characterization of his lawsuit does not require a response from DPG other than that DPG denies that it committed violations of the False Claims Act and made numerous

submission of false and/or fraudulent claims for payment to federally-funded Medicare and Medicaid programs as well as other Government Healthcare Programs as a result of referrals that were illegal under the Stark Law and Federal Anti-Kickback Laws. DPG lacks sufficient information or knowledge to admit or deny the remaining allegations of paragraph eighty-three, and therefore denies the same.

84.    On July 27, 2011, just a few minutes after 4:55 pm, Dr. Heesch was called into his own office and in the presence of Marc Gottlieb, M.D. and Maher Sahawneh, M.D., both Defendant DPG Board of Director members, and Dr. F. Martin Lester, DPG President. Dr. Heesch was advised by Lester: "That's it. As of today, unless you want to work for another week, it's – you're not working with us no more". Further, Lester told Dr. Heesch regarding his termination that: "… it was a vote of the Board of Trustees – the Board, or whatever it is, is 100 percent – to terminate you as of this time. And you can ask Barre [Sanders] and you can stay until next – next week, through next week, to take care of any of your patients." Accordingly, on July 27, 2011, Defendants terminated Dr. Heesch's employment and status as a shareholder of Defendant DPG.

**Response:**    DPG admits that it terminated Dr. Heesch's employment on or about July 27, 2011. DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph eighty-four, and therefore denies the same.

85.    At the July 27, 2011 termination meeting, Maher Sahawneh, M.D., ("Dr. Sahawneh") informed Dr. Heesch that the reasons ostensibly justifying Dr. Heesch's termination had been brought formally to the attention of DPG's Board "…over the course of the past few weeks", corresponding exactly to the time frame between June 9, 2011 (Dr. Heesch's initial request for DPG's financial documents) and his expulsion (July 27, 2011).

**Response:**    DPG denies Plaintiff's implication that his termination was in retaliation for his records request.  DPG denies that the reasons it gave for terminating Plaintiff were ostensible or

pretextual. DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph eighty-five, and therefore denies the same.

86.     In that same July 27, 2011 meeting, Dr. Sahawneh also informed Dr. Heesch that he (Heesch) was a "terrific doctor". However, as far as Dr. Heesch's records request was concerned, Dr. Sahawneh stated that "…it's just like a pyramid. Okay. Martin Lester has been around for a while. He's at the top of the pyramid"… "You're down here and you're trying to tunnel into the top, and it's going to cause everything to crumble". Referring to Dr. Heesch's insistence to obtain the requested records, Dr. Sahawneh clarified: "It's disruptive. You have the right, but it is disruptive."

**Response:**     DPG admits that Dr. Sahawneh complimented Plaintiff's skills as a cardiologist. DPG denies that it terminated Plaintiff in retaliation for his records request and denies that Dr. Sahawneh said or implied that Plaintiff was terminated in retaliation for his records request.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph eighty-six, and therefore denies the same.

87.     On July 28, 2011, Dr. Heesch met with and spoke with J. Donald Kirby, M.D. ("Dr. Kirby"), a DPG physician, shareholder and member of the Board of Directors, to discuss the reasons behind his termination, and to at last gain clarification on his concerns about the physician reimbursement. Referring to Dr. Heesch's financial records request, Dr. Kirby told Dr. Heesch that "… it's ludicrous what he [Dr. Heesch's forensic accountant] asked for. And, I mean, Barre [Sanders] just looked at it and said – said look at this. You know, I mean he showed me one item of the 25 or so that he wanted, 25 or 30 and I lost count. But one item was Medicare, Medicaid billing for every doctor for the last five years. For me, for this year, it would be this thick. And for 70 of us times five, or 350 of those things…" Referring to the auditors Dr. Heesch had hired to help him with his inquiry into DPG's payment methodology, Dr. Kirby flatly stated: "They are f_ _ _ _ _ _ _ us!" (expletive deleted)

**Response:**      DPG admits, upon information and belief, that Dr. Kirby was frustrated by Plaintiff's records request because it was so overly broad and unduly burdensome.  DPG denies that it terminated Plaintiff in retaliation for his records request and denies that Dr. Kirby said or implied that Plaintiff was terminated in retaliation for his records request.  DPG lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph eighty-seven, and therefore denies the same.

88.      Dr. Heesch expressed his desire to finally understand DPG's compensation reimbursement methodology, by asking: "So that in the end if you do refer, I mean, more to that, you get more Stark money or what? I mean, I don't know"

Dr. Kirby answered: "Yeah. …"

**Response:**      Because the allegations in paragraph eighty-eight are so lacking in detail and so vague and confusing, among other things, DPG lacks sufficient information or knowledge to admit or deny the allegations, and therefore denies the same.  DPG further responds by denying any implication that Dr. Kirby said or implied that the DPG compensation arrangement violated the Stark law, or that it did violate the Stark law.

89.      Dr. Kirby further explained: "And for us, it's just a matter of you see more patients, you do more lab work, you do more x-rays, you do more stress tests, and you get rewarded more than the guy, like Lerner [DPG gastroenterologist who doesn't order many tests], who doesn't do any of that stuff."

**Response:**      DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph eighty-nine, and therefore denies the same.  DPG further responds by denying any implication that Dr. Kirby said or implied that the DPG compensation arrangement violated the Stark law, or that it did violate the Stark law.

90.     Dr. Kirby further told Dr. Heesch that the feeling was that "you mistrusted administration, mistrusted the Mobile Infirmary, mistrusted Martin [Lester] and his dealings with the Mobile Infirmary…."

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph ninety, and therefore denies the same.  DPG further responds by denying any implication that Dr. Kirby said or implied that the DPG compensation arrangement violated the Stark law, or that it did violate the Stark law.

91.     Specifically addressing Dr. Heesch's concerns regarding underhanded financial dealings at DPG, Dr. Kirby said:" …if you ask somebody like Jonathan Miller [DPG internist], he said, look, I'm making so much money compared to other guys that I know, and he said, whatever is going on here, I am all for it".

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph ninety-one, and therefore denies the same.  DPG further responds by denying any implication that Dr. Kirby said or implied that the DPG compensation arrangement violated the Stark law, or that it did violate the Stark law.

92.     On July 30, 2011, Dr. Heesch had another meeting with Lester to discuss the same issues addressed with Dr. Kirby. Lester assured Dr. Heesch that, regarding his (Heesch's) work, "" …you are a great doctor, a physician." In reference to Dr. Heesch's records request, however, Dr. Lester told Heesch that it had "…made everybody mad, and they're really mad about having that jerk lawyer of yours all those records." Lester went on to state in reference to Dr. Heesch's records request: "You shouldn't. That was really a disaster."

**Response:**     DPG lacks sufficient information or knowledge to admit or deny the allegations in paragraph ninety-two, and therefore denies the same. DPG further responds by denying any implication that Dr. Lester said or implied that the DPG terminated Plaintiff's employment  in retaliation for his records request.

93.     Defendants' retaliatory discharge of Dr. Heesch was motivated by his engagement in protected activities, and in particular his inquiry into the compensation methodology employed by Defendants to compensate Defendant DPG physicians, which included physician compensation from patient self-referrals which were illegal under the Stark Law (42 U.S.C. § 1395nn) and Federal Anti-Kickback Laws (42 U.S.C. § 1320a-7b). and the FCA, of which Defendants had knowledge.

**Response:**     Denied.

94.     Dr. Heesch's termination and discharge on July 27, 2011 were the result of his undertaking the investigation the subject of the *qui tam* action as set out in the United States Complaint In Intervention and the allegations contained therein and similar allegations originally set out and contained in Relator's initial Complaint, First Amended Complaint and Second Amended Complaints filed by him on behalf of the United States asserting claims pursuant to the qui tam provisions of the FCA for violations committed by Defendants for numerous submissions of false and/or fraudulent claims by Defendants for payment to Government Healthcare.

**Response:**     Denied.

95.     Dr. Heesch's retaliatory discharge was due, in part, to his investigative activities as follows:

(a)     when, in November, 2008, Dr. Heesch requested an audit, he was screamed down the same day, threatened with firing by telephone the next day, and threatened with firing by letter one week later;

(b)     when, on June 9th, 2011 DPG received a financial record's request through Dr. Heesch's counsel, and Dr. Heesch was given **one hour later**, written notice that he would have to leave; and

(c)     when, on June 11, 2011, Dr. Heesch openly expressed distrust of DPG's financial dealings, he received a letter asking him to resign one day later; and finally

(d)     when, on July 27, 2011, Dr. Heesch was discharged from his shareholder status and his employment with Defendants was terminated.

**Response:**     Denied.

96.     Defendants have a duty under 31 U.S.C. § 3730(h) of the FCA to refrain from taking retaliatory actions against employees who undertake protected activities in furtherance of the FCA, including investigation for, testimony for, or assistance in an FCA action.

**Response:**     The allegations in paragraph ninety-six contain legal conclusions to which no response is required.  To the extent a response is deemed required, DPG answers that the statute speaks for itself and denies Plaintiff's allegations to the extent they seek to misstate or mischaracterize such statute.

97.     Dr. Heesch undertook protected activities and actions in furtherance of the action the subject of the United States' Complaint In Intervention and the Complaint and amendments thereto referenced above he filed on behalf of the United States, including but not limited to investigation, assistance and cooperation, all of which is ongoing, in the referenced actions and claims filed pursuant to the FCA and, as such, Dr. Heesch engaged in protected activities under the FCA and other laws.

**Response:**     Denied.

98.     The actions of Defendants damaged and will continue to damage Dr. Heesch in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

**Response:**     Denied.

99.     Pursuant to 31 U.S.C. § 3730(h), Dr. Heesch is entitled to litigation and investigative costs and reasonable attorneys' fees incurred in the vindication of his reputation, which has been severely damaged, and the pursuit of his retaliation claims.

**Response:**     Denied.

WHEREFORE, Defendant Diagnostic Physicians Group, P.C. requests that the Third Amended Complaint be dismissed in its entirety, with prejudice, and that the Court order such other relief as is necessary to do justice.

## ADDITIONAL DEFENSES

Defendant Diagnostic Physicians Group, P.C. hereby asserts the following additional and affirmative defenses, without assuming the burden of proof or production where it ordinarily lies with Plaintiff.

## FIRST DEFENSE

The Plaintiff's complaint, in whole or in part, fails to state a claim for which relief may be granted.

## SECOND DEFENSE

The Plaintiff's claims, in whole or in part, are barred by acquiescence, waiver, consent, and/or estoppel.

## THIRD DEFENSE

The Plaintiff's claims are barred to the extent he failed to mitigate his alleged damages, if any.

## FOURTH DEFENSE

The Third Amended Complaint should be dismissed, in whole or in part, on the grounds that DPG's actions toward Plaintiff were premised upon legitimate, nondiscriminatory, non-retaliatory reasons that were not pretextual and that DPG's actions toward Plaintiff were done in good faith.

## FIFTH DEFENSE

DPG denies each and every allegation contained in Plaintiff's Third Amended Complaint that has not been admitted herein and demands strict proof with respect to all allegations.

## SIXTH DEFENSE

DPG denies that Plaintiff is entitled to any relief whatsoever.

## SEVENTH DEFENSE

DPG denies that any of Plaintiff's alleged damages were proximately caused by any act, omission or misconduct of DPG.

## EIGHTH DEFENSE

DPG denies that Plaintiff has suffered any damages as a result of any alleged acts and/or omissions of DPG.

## NINTH DEFENSE

DPG states that Plaintiff's own conduct proximately caused any and all damages sought in the Third Amended Complaint.

## TENTH DEFENSE

DPG asserts the defense of unclean hands on the part of Plaintiff.

## ELEVENTH DEFENSE

Even if Plaintiff could prove discriminatory and/or retaliatory conduct on the part of DPG (which Plaintiff cannot), DPG is entitled to a judgment in its favor because DPG's actions towards Plaintiff would have been undertaken even had the Plaintiff not allegedly engaged in the alleged protected conduct (i.e., DPG relied upon a permissible reason in making any and all changes to the terms of Plaintiff's employment).

## TWELFTH DEFENSE

DPG states that there is no causal connection between Plaintiff's alleged involvement in protected conduct and DPG's conduct towards Plaintiff.

## THIRTEENTH DEFENSE

With respect to any punitive damages claimed, DPG asserts that Plaintiff is not entitled to receive said damages in view of the fact that any award of punitive damages would violate the

41

constitutional safeguards provided to DPG under the Constitutions of the State of Alabama and the United States of America.

## FOURTEENTH DEFENSE

Plaintiff's claim for the recovery of punitive damages is barred by and/or subject to all applicable limitations established by the Alabama legislature, including those set forth in §§ 6-11-21, *et seq*., Code of Alabama.

## FIFTEENTH DEFENSE

DPG acted at all times in good faith towards Plaintiff.

## SIXTEENTH DEFENSE

The Third Amended Complaint should be dismissed, in whole or in part, on the grounds that the relief demanded by Plaintiff is improper, inappropriate or otherwise not available under the laws upon which his claims rest.

## SEVENTHEENTH DEFENSE

DPG denies that it is liable for conduct to which punitive damages could or should be awarded, and denies that Plaintiff has produced clear and convincing evidence sufficient to support or sustain the imposition of punitive damages against DPG.

## EIGHTEENTH DEFENSE

Plaintiff's claims and requested relief are barred, in whole or in part, by the after-acquired evidence rule.

## NINETEENTH DEFENSE

DPG is entitled to judgment on Plaintiff's claims under the mixed motive doctrine.

## TWENTIETH DEFENSE

DPG is entitled to judgment on Plaintiff's claims because Plaintiff cannot show that an impermissible reason was a motivating factor for DPG's alleged retaliatory conduct.

## TWENTY-FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, by DPG's justification for its actions.

## TWENTY-SECOND DEFENSE

Plaintiff's alleged damages, if any, are subject to a set-off due to, among other things, Plaintiff's bad faith conduct.

## TWENTY-THIRD DEFENSE

Plaintiff is barred from recovering punitive damages because such damages are impermissible relief for the cause of action asserted by Plaintiff.

## TWENTY-FOURTH DEFENSE

Plaintiff's claim and allegations are barred, in whole or in part, by the applicable statute of limitations.

## DEMAND FOR JURY TRIAL

Dated: December 30, 2013

/s/ David W. Proctor
David W. Proctor (PROCD3254)
Daniel J. Martin (MARTD8327)
Attorneys for Defendant Diagnostic Physicians
Group, P.C.

**JOHNSTON BARTON PROCTOR & ROSE LLP**
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, Alabama  35209
Telephone:   (205) 458-9400
Facsimile:   (205) 458-9500
Email:       dwp@johnstonbarton.com
             djm@johnstonbarton.com

/s/ James B. Newman
James B. Newman (NEWMJ8049)
Attorney for Defendant Diagnostic
Physicians Group, P.C.

**HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE**
Post Office Box 2767
Mobile, Alabama  36652
Telephone:      251-432-5521
Email:             jbn@helmsinglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on  December 30, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel registered to receive notice from the system.

/s/ Daniel Martin
Daniel J. Martin

44