IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* Christian M. Heesch, | ) ) ) | |
| Plaintiff(s), | ) ) | |
| vs. | ) ) | Civil Action No. 11-0364-KD-B |
| DIAGNOSTIC PHYSICIANS GROUP, P.C.; IMC–DIAGNOSTIC AND MEDICAL CLINIC, P.C.; IMC–NORTHSIDE CLINIC, P.C.; INFIRMARY MEDICAL CLINICS, P.C.; and INFIRMARY HEALTH SYSTEM, INC., | ) ) ) ) ) | |
| Defendants. | | |

## **ORDER**

This action is before the Court on Defendant Diagnostic Physicians Group, P.C.'s ("DPG") Motion for Summary Judgment (Doc. 415) and supporting materials (Docs. 418 – 420), together with the Response (Doc. 450) and supporting materials (Docs. 442 – 449) filed by Christian M. Heesch, M.D. ("Relator"), and DPG's Reply (Doc. 454). Upon consideration and for the reasons set forth herein, DPG's motion for summary judgment is DENIED.

**I.   Procedural History**

Relator Christian M. Heesch originally filed this action on July 8, 2011 against the above-named Defendants, including DPG, based on alleged False Claims Act ("FCA") violations. (Doc. 1). After investigation, the Government filed its Complaint in Intervention on August 7, 2013. (Doc. 30). The Court

later dismissed certain claims against Defendants Infirmary Medical Clinics, P.C., IMC-Northside, P.C., and Infirmary Health Systems, P.C. (Doc. 304). In July 2014, the Government and the remaining Defendants settled other claims relating to Anti-Kickback and Stark violations. (Doc. 441).

The parties did not settle Relator's claim for retaliatory discharge raised in his second (Doc. 21, p. 36) and third amended complaints (Doc. 66, p. 20), which is a claim for relief under the FCA's whistleblower provisions. 31 U.S.C. § 3730(h). In his amended complaints, Relator alleges that he had an employment agreement with DPG. (Doc. 66, p. 20). Relator further alleges that as a result of his investigating DPG's unlawful practices, DPG leadership and DPG physicians retaliated against him by harassing him and ultimately voting to terminate his employment. (Doc. 21, p. 36; Doc. 66, p. 4). DPG denies wrongdoing, and moves this Court for summary judgment on Relator's retaliation claim. (Doc. 415; Doc. 418, Exh. 1, p. 1).

## II. Standard of Review

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

> **(1) *Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record,

> including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

3

absence of a genuine issue of material fact. Clark v. Costs & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If a non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and determining credibility. Instead, the Court must draw all justifiable inferences in favor of the non-moving party. Tipton v. Bergohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

## III.    Facts[1]

Relator worked as a cardiologist for DPG from January 2004 until July 2011. (Doc. 419, Exh. 1, p. 1; Doc. 449, Exh. 1, p. 9). During his tenure at DPG, Relator often submitted written complaints about compensation and other work related issues to his superiors. (Doc. 420, Exh. 5, pp. 53 – 85). In 2004, for example, Relator sent a twelve-page single-spaced letter to the

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

4

Infirmary Chief of Staff, expressing his concerns about the catheterization laboratory. (Doc. 420, Exh. 5, pp. 53 – 64). In 2006, Relator objected to the DPG Board in writing after it asked cardiologists from the Heart Group to join DPG. (Doc. 420, Exh. 5, pp. 67 – 69). In 2007, Relator documented his complaints regarding call coverage, (Doc. 420, Exh. 2, p. 18) and, in 2009, Relator wrote about his frustration with an insurance company sending his confidential credentialing papers via fax to a DPG receptionist. (Doc. 420, Exh. 5, p. 70).

The record plainly shows Relator did not shy away from making his complaints known. (Doc. 420, Exh. 5, pp. 53 - 85). His peers acknowledged that he provided quality patient care, (Doc. 449, Exh. 1, p. 1), but also made it clear that Relator could be difficult to work with at times. (Doc. 419, Exh. 1, pp. 3 – 8). In 2010, the other DPG cardiologists sent two formal letters to the DPG Board, dated August 2, 2010 and September 30, 2010 respectively, expressing their concerns about Relator and his inability to work with others. (Doc. 420, Exh. 2, p. 32 - 34, 38 - 39). After receiving the first of these two letters, Dr. Martin Lester, DPG President, encouraged Relator to relax and "realize you are a great doctor and try to [be] a part of the group." (Doc. 420, Exh. 2, p. 37).

Despite the sometimes-tumultuous relationship between Relator and his coworkers, DPG continued employing Relator until July 2011. In 2011, Relator's complaints to and about DPG intensified. (Doc. 420, Exh. 5, pp. 84 –

5

86; Doc. 450, Exh. 1, pp. 2 – 4). At the same time, his coworkers continued expressing their displeasure about Relator's behavior. (Doc. 420, Exh. 3, pp. 40 – 42, 54 – 55). The increasingly strained working relationship led Dr. Lester to send a short memo to Relator on April 27, 2011, asking him to check a box for one of two options: to discuss his future with DPG, or resign. (Doc. 420, Exh. 3, p. 52). Around the same time, Relator decided to hire independent legal counsel. (Doc. 449, Exh. 1, p. 4).

After Relator hired counsel, he formally requested on June 9, 2011 extensive records from DPG concerning physician compensation, Medicare payments, and other financial documents. (Doc. 420, Exh. 4, pp. 1 - 5). On June 13, 2011, Relator's counsel made a second request for information, which included an express request for records and documents "reflecting each physician's share of the Stark Pool collections," and "total Stark collections of the Group and specific allocation of collections to each doctor based on tests ordered but not performed by each physician" for 2004 through 2010. (Doc. 442, Exh. 1, pp. 5 – 8). Also on June 13, the DPG Board discussed terminating Relator's employment. (Doc. 442, Exh. 1, pp. 11, 16). Two weeks later, on June 27, Dr. Lester announced at a DPG group meeting that an "unnamed shareholder" had retained independent counsel, and "if any suits are filed they will be defended." (Doc. 442, Exh. 1, pp. 52 - 54).

On July 8, 2011, Relator filed this action under seal. (Doc. 1). Shortly thereafter, the exchanges between Relator and DPG sharpened. On July 11,

6

Relator learned at a DPG meeting that the group had previously received legal advice regarding their potentially illegal physician compensation structure, and he expressed his concerns. (Doc. 449, Exh. 1, p. 7). On July 12, Dr. Lester sent Relator a letter that said his actions at the July 11 meeting were the "final straw," and that he should resign. (Doc. 420, Exh. 4, p. 21). Relator did not resign. Relator sent a letter to Dr. Lester on July 13, which stated "DPG and the Mobile Infirmary were breaking the law regarding 'Stark Money' payments, and had been doing so for years."[2] (Doc. 420, Exh. 4, pp. 22 - 23). On July 21, the DPG Board, with Dr. Lester serving as Chairman, held a special meeting to terminate Relator. (Doc. 443, Exh. 1, p. 71 – 73). On July 25, the Board unanimously adopted a resolution to terminate Relator, (Doc. 443, Exh. 1, p. 73 – 76), and he received notification of this decision on July 27, 2011. (Doc. 450, Exh. 1, p. 16).

After being fired, Relator went back to his office at various times to gather his belongings. (Doc. 449, Exh. 1, pp. 9 – 10). While collecting these items, Relator hid a recording device in his shirt pocket so he could secretly record his conversations with his former colleagues. (Doc. 419, Exh. 1, p. 19).

---

[2] Relator criticized attorney William Horton's previous association with HealthSouth. (Doc. 449, Exh. 1, p. 7). While Horton worked as general counsel for HealthSouth, the former CEO of HealthSouth, Richard Scrushy, was charged under the Sarbanes-Oxley Act for altering financial returns, and later was convicted on political corruption charges for money laundering, obstruction, racketeering, and bribery. See S.E.C. v. Healthsouth Corp., 261 F. Supp. 2d 1298, 1323 (N.D. Ala. 2003); U.S. v. Scrushy, 237 F.R.D. 464, 470 (M.D. Ala. 2006). Relator knew about this conviction, and wrote that he had a right to "voic[e] distrust" and "did not wish to share a cell with Scrushy." (Doc. 420, Exh. 4, p. 22 – 23).

Relator and DPG both use excerpts from these transcribed recordings to support their claims. (Doc. 418, Exh. 1, pp. 1, 4 – 5; Doc. 450. Exh. 1, pp. 16 – 19). DPG points to comments such as the one made by DPG Director Dr. Donald Kirby, that the "biggest concern goes back to the coverage arrangement," to support its argument that it did not retaliate against Relator. (Doc. 419, Exh. 1, p. 15). In contrast, Relator highlights DPG Director Dr. Maher Sahawneh saying, "It's disruptive. You have the right, but it is disruptive," to support his claim that he was terminated in retaliation for investigating DPG. (Doc. 449, Exh. 1, p. 10).

DPG maintains that it did not know Relator was investigating fraud on the government until December 2011, when it received a subpoena from the Department of Health and Human Services Office of Inspector General seeking information on Stark Law compliance, along with Relator's personnel file. (Doc. 418, Exh. 1, p. 2). DPG now moves the Court for summary judgment on Relator's retaliatory discharge claim.

IV. Analysis

    a. Establishing a Prima Facie Retaliation Case

The FCA's whistleblower protection provision entitles an employee who is discharged or discriminated against in the terms and conditions of his employment, as the result of engaging in protected activity, to reinstatement and other relief necessary to make the employee whole. 31 U.S.C. §

3730(h)(2) (2010).³ To establish a prima facie retaliation case, a relator must prove: (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action. Mann v. Olsten Certified Healthcare Corp., 49 F. Supp. 2d 1307, 1317 (M.D. Ala. 1999) (citing Bechtel Const. Co. v. Sec'y of Labor, 50 F.3d 926, 934 (11th Cir. 1995)).⁴ It is not enough to plead that the employee

---

³ During the period pertinent to this case, Congress twice amended 31 U.S.C. § 3730(h). Relator thus presents a claim potentially spanning three different versions of the statute, i.e., the pre-May 20, 2009 version (the "1986 version"), the version in effect from May 20, 2009 to July 21, 2010 (the "FERA version"), and the post-July 21, 2010 version (the "Dodd-Frank version"). FERA extended the scope of Section 3730(h) to cover contractors or agents engaging in protected activity intended to "stop 1 or more [FCA] violations." Fraud Enforcement & Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat. 1617 (codified at 31 U.S.C. § 3730(h) (2009)). Dodd-Frank added a new provision to Section 3730(h) setting a uniform statute of limitations for retaliation actions at "3 years after the date when the retaliation occurred." Dodd–Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 137,631 (codified at U.S.C. § 3730(h)(3) (2010)). Ultimately, each version of the statute applies to "employees" who act "in furtherance of an action under this section," so Relator's retaliation claim is not affected by the changes to Section 3730(h).

⁴ This Court is following the four elements as set forth in Mann, which has been favorably cited by the Eleventh Circuit. See U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1304 (11th Cir. 2010); Mack v. Augusta-Richmond Cnty, Ga., 148 F. App'x 894, 897 (11th Cir. 2005) (unpublished). Other courts use a prima facie test with only three elements: (1) the employee engaged in protected activity; (2) the employer had knowledge that the employee was engaged in protected activity; and (3) the employer retaliated against the employee because of this conduct. (Doc. 419, Exh. 1, p. 5); see, e.g., McKenzie v. BellSouth Telecomm., Inc., 219 F.3d 508, 514 (6th Cir. 2000). Still other courts analyze only two elements. (Doc. 450, Exh. 1, p. 20); see, e.g., Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 186 (3d Cir. 2001) (plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was

took actions in furtherance of a qui tam suit; rather, an employee must also prove that his employer knew of him taking these actions. See U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1304 (11th Cir. 2010).

Here, the parties do not contest the first and third elements required for a prima facie retaliation claim. DPG received federal funds through Medicare payments, making it subject to the FCA. DPG terminated Relator's employment, showing that Relator suffered adverse action.

The parties dispute the other two elements required for retaliatory discharge: whether Relator engaged in protected activity, and whether an inference of causation exists between Relator's protected conduct and his being terminated. To this end, DPG seeks summary judgment on the grounds that 1) it was not aware that Relator's inquiries into compensation and corporate compliance were in furtherance of protected activity until December 2011, 2) thus there is no causal link between terminating Relator's employment on July 25, 2011 and the protected activity, and 3) DPG provided evidence of legitimate, non-retaliatory reasons for terminating Relator. (Doc. 418, Exh. 1, p. 1).

### i. Relator engaged in protected activity

"Protected activity" is broadly construed. See Childree v. UAP/GA CHEM, Inc., 92 F.3d 1140, 1146 (11th Cir. 1996). For activity to receive

---

motivated, at least in part, by the employee's engaging in "protected conduct"). Nonetheless, the various tests used are similar to the four-element test applied here.

"protection" under the FCA, a plaintiff must have taken steps "in furtherance of" an FCA action during his employment. 31 U.S.C. § 3730(h)(1). This means that a nexus must exist between the actions that the employee takes and exposing fraud or false claims. Investigating or complaining about fraud, for example, may show that an employee has "taken steps" toward exposing false claims, and is therefore engaging in protected activity. Marbury v. Talladega Coll., 2014 WL 234667 (N.D. Ala. Jan. 22, 2014). The employee's actions must be "sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee." Sanchez, 596 F.3d at 1304.

Here, Relator began taking steps toward exposing false claims when he hired independent counsel and requested information from DPG relating to their financial records and Stark collections. Thus Relator engaged in protected activity. DPG concedes that Relator's act of filing this lawsuit was protected activity. (Doc. 418, Exh. 1, p. 6). DPG argues, however, that Relator "failed to put DPG on notice" that he "had *any* concern regarding fraud on the government." (Doc. 418, Exh. 1, p. 2). The thrust of DPG's argument is not whether Relator engaged in any protected activity; rather, it is whether Relator's conduct amounted to protected activity that would reasonably put DPG on notice of alleging fraud on the government. (Doc. 418, Exh. 1, p. 7). Relator likewise argues he need only show that he engaged in protected activity from which a fact-finder could reasonably conclude that he was

contemplating a qui tam action or reporting DPG to the government for fraud to survive summary judgment. (Doc. 450, Exh. 1, p. 21).

### ii. Notice of protected activity

A prima facie retaliation claim requires notice of protected activity. Id.; U.S. ex rel. Ramseyer v. Cent. Healthcare Corp., 90 F.3d 1514, 1522 (10th Cir. 1996) ("If defendants were not afforded such notice, then, *a fortiori,* their actions could not constitute retaliation."). If an employer does not know an employee is investigating or complaining about fraud, then the employer cannot retaliate against the employee for that reason. For notice, it is sufficient merely that the employee complained directly to his supervisors, so long as the employee tells the employer that he is concerned about possible fraud. See Sanchez, 596 F. 3d at 1304.

DPG argues that it was not aware of Relator's protected activity when it terminated his employment, and therefore it could not have retaliated against him. (Doc. 418, Exh. 1, p. 25). Drawing inferences in favor of the non-moving party, the Court disagrees. Relator hired independent counsel in 2011. In June, his attorney requested extensive financial documents from DPG, which reasonably could have alerted DPG to potential legal action. Among other things, Relator's counsel and forensic analyst asked specifically for information on Medicare and Medicaid payments, pooled monies, referral fees, residual profits, and the billing and collection amounts on professional services separated by group member. The letter from Relator's counsel dated

June 13 further indicates an inquiry into Stark and FCA issues by asking specifically about Stark collections and tests "ordered but not performed by" physicians. (Doc. 442, Exh. 1, pp. 5 – 8). Though DPG asserts Relator couched his activities in general compensation concerns, Relator undeniably put DPG on notice of a potential FCA issue when he sent his July 13 letter to Dr. Lester. A fact-finder, therefore, could reasonably conclude DPG feared Relator was contemplating a qui-tam action or reporting fraud to the government. See Mann, 49 F. Supp. 2d at 1314.

Additionally, Relator is not an employee charged with investigating fraud. (Doc. 418, Exh. 1, p. 8). Other courts have identified a heightened notice requirement for employees who are charged with investigating fraud, such as compliance officers. Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 484 (7th Cir. 2004) (citing Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd., 277 F.3d 936, 945 (7th Cir. 2002) (discussing how these cases suggest that a "fraud-alert" employee may be expected to use words like "illegal" or "unlawful" when sharing her concerns with her employer). Because he was not a fraud-alert employee, Relator does not need to meet a heightened notice requirement. Here, Relator satisfied the notice requirement by complaining to his superiors about Stark, physician compensation, and potential illegalities.

### iii. Adverse action because of the protected activity

As the last element of Relator's prima facie case, he must offer

evidence that would support a reasonable trier of fact in concluding that he was terminated, at least in part, because of his protected activity. Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997). "The showing necessary to demonstrate the causal-link part of the prima-facie case is not onerous." Mann, 49 F. Supp. 2d at 1317. Relator "merely has to prove that the protected activity and the negative employment action are not completely unrelated." Id. In some instances, a prima facie case can be made on temporal proximity alone if the adverse action suffered by the employee is "very close" in time to the protected activity. Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001).

The evidence shows DPG may have had other valid reasons to terminate Relator's employment, but Relator must establish only that his termination and his protected activity are not unrelated. Here, there is sufficient evidence to clear the low bar set for establishing this element. Only two weeks passed between Relator's July 13 letter expressly citing Stark violations and DPG terminating his employment. Additionally, DPG asked Relator to resign shortly after he hired counsel and began inquiring about their financial records. This is sufficient evidence to conclude that Relator's protected activity and termination were not completely unrelated.

### b. Burden shifting after establishing a prima facie retaliation case

A prima facie retaliation case raises a presumption that the employer

is liable to the employee. Then, "the burden shifts to the employer to 'produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason.' Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004)) (alteration in original). Once that occurs, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer ... retaliation from all the evidence.' Id." U.S. ex rel. Schweizer v. Oce 677 F.3d 1228, 1240-41 (D.C. Cir. 2012).[5]

DPG has articulated a legitimate, non-retaliatory reason for terminating Relator's employment. Those reasons are echoed in the Board's July 25 resolution regarding his termination. (Doc. 443, Exh. 1, p. 71 - 76). The proffered justification is primarily Relator's lack of cooperation and detrimental behavior. This includes not only the exchanges that took place in 2011, but also the accumulation of Relator's interactions with his colleagues at DPG over the years. DPG has successfully articulated a legitimate reason

---

[5] The Eleventh Circuit has not expressly applied the McDonnell Douglas burden-shifting framework applies to retaliation claims under the FCA. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). However, other courts have determined its applicability. See U. S. ex rel. Sxhweizer v. Oce N.V., 677 F.3d 1228, 1241 (D.C. Cir. 2012) (adopting approach but explaining that "[t]his burden shifting framework is a useful screening device in the summary judgment milieu, but courts typically put it aside once the third step is reached); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 30–31 (1st Cir. 2012) (stating that "[t]he McDonnell Douglas approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1)"). This Court likewise finds it appropriate to apply this modified framework to an FCA retaliation claim.

15

for terminating Relator's employment.

However, the court also finds that a reasonable jury could infer that retaliation was also a motivating factor in Relator's termination. The Court finds particularly significant the timing of Relator's termination; five weeks after Relator's counsel requested information regarding payments covered by the Stark law and one week after Relator wrote a letter stating Relator's belief that DPG was violating the Stark law. In sum, there are credibility and factual determinations that must be made by a jury as to why DPG terminated Relator.

V.     **Conclusion**

The Court finds that Relator has demonstrated there are genuine disputes of material facts for his retaliatory discharge claim. As a result, there are allegations in this case that a fact-finder must decide, and Relator's retaliation claim cannot be decided as a matter of law. Accordingly, DPG's Motion for Summary Judgment is **DENIED.**[6]

**DONE and ORDERED** this 5th day of August 2014.

/s/ Kristi K. DuBose
**UNITED STATES DISTRICT JUDGE**

---

[6] The practice of filing motions to reconsider has become commonplace. Considering the heightened burden that must be met for the court to reconsider, the court has found most such motions to be a waste of the court's and the parties' resources.